

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-1-2007

# Bowers v. Natl Collegiate

Precedential or Non-Precedential: Precedential

Docket No. 05-2426

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Bowers v. Natl Collegiate" (2007). *2007 Decisions.* Paper 1554.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1554

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 05-2262, 05-2268, 05-2269 and 05-2426

———

KATHLEEN BOWERS,
        Appellant, No. 05-2269

v.

THE NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,
as an Association and a Representative of its
Member Schools, a/k/a NCAA;
TEMPLE UNIVERSITY;
UNIVERSITY OF IOWA

        *Barbara E. Ransom,
                Appellant, No. 05-2262

        *Richard L. Bazelon,
                Appellant, No. 05-2268

        *(Pursuant to FRAP 12(a))

        University of Iowa,
                Appellant, No. 05-2426

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 97-cv-02600)
District Judge:  Honorable Jerome B. Simandle

————

Argued September 11, 2006
Before:  FUENTES, FISHER and BRIGHT,[*] *Circuit Judges*.

(Filed: February 1, 2007)

A. Richard Feldman (Argued)
Richard L. Bazelon
Noah H. Charlson
Bazelon, Less & Feldman
1515 Market Street, 7th Floor
Philadelphia, PA  19102

Barbara E. Ransom
Public Interest Law Center
 of Philadelphia
125 South 9th Street, Suite 700
Philadelphia, PA  19107
        *Attorneys for Kathleen Bowers*

————

[*]The Honorable Myron H. Bright, United States Circuit
Judge for the Eighth Circuit, sitting by designation.

Barbara W. Mather (Argued)
Christopher J. Huber
Pepper Hamilton
18th and Arch Streets
3000 Two Logan Square
Philadelphia, PA  19103
      *Attorneys for Barbara E. Ransom*

Daniel Segal
Michele D. Hangley
Hangley, Aronchick, Segal & Pudlin
One Logan Square, 27th Floor
Philadelphia, PA  19103
      *Attorneys for Richard L. Bazelon*

Jessica D. Silver
Sarah E. Harrington (Argued)
U.S. Department of Justice
Civil Rights Division/Appellate Section
P.O. Box 14403
Ben Franklin Station
Washington, DC  20044-4403
      *Attorneys for United States of America*

John B. Langel (Argued)
Shannon D. Farmer
Ballard, Spahr, Andrews  & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, PA  19103
      *Attorneys for Temple University*

J. Freedley Hunsicker, Jr. (Argued)
Drinker, Biddle & Reath
18th and Cherry Streets
One Logan Square
Philadelphia, PA  19103
        *Attorneys for National Collegiate*
        *Athletic Association*

Jack J. Wind
Margulies, Wind & Herrington
15 Exchange Place, Suite 510
Jersey City, NJ  07302

Gordon E. Allen
Mark Hunacek (Argued)
Office of Attorney General of Iowa
1305 East Walnut Street
Hoover State Office Building, 2nd Floor
Des Moines, IA  50319
        *Attorneys for University of Iowa*

_____

OPINION OF THE COURT

_____


FISHER, *Circuit Judge*.

This case arises out of a high school athlete's claims that the National Collegiate Athletic Association ("NCAA") and several related institutions subjected him to unlawful discrimination based on his learning disability.  During the

4

course of the proceedings, plaintiff Michael Bowers met an untimely death and his mother Kathleen Bowers has been substituted for him.  As a matter of convenience, throughout this opinion the plaintiff-appellant will be referred to simply as "Bowers."  In this consolidated appeal, Bowers alleges the District Court abused its discretion by entering preclusion sanctions against her based on its finding that she and her attorneys committed discovery violations in bad faith.  She further argues the District Court erred when it granted the Defendants' motion for summary judgment, which relied in large part on the preclusion sanctions imposed.  Attorneys for Bowers each appeal separately from the sanctions order with respect to their reputations, arguing the District Court's failure to provide them with notice and an opportunity to be heard on the issue amounted to a violation of procedural due process.  Finally, the University of Iowa cross appeals from orders dismissing its motions asserting Eleventh Amendment immunity to Bowers' claims.  For the reasons set forth in this opinion, we will reverse the District Court on its grant of summary judgment, and, in part, on its order of preclusion sanctions against Bowers and her attorneys, and find that the University of Iowa is an arm of the state for purposes of Eleventh Amendment immunity but that Congress validly abrogated sovereign immunity under Title II of the Americans with Disabilities Act.

## I.  BACKGROUND

A.     Factual History

This protracted dispute, spanning nearly a decade thus far, has yielded eleven prior opinions, ten by the District Court and one by our own.  *See Bowers v. NCAA*, 974 F. Supp. 459

(D.N.J. 1997) ("*Bowers I*"); *Bowers v. NCAA*, 9 F. Supp. 2d 460 (D.N.J. 1998) ("*Bowers II*"); *Bowers v. NCAA*, 118 F. Supp. 2d 494 (D.N.J. 2000) ("*Bowers III*"); *Bowers v. NCAA*, 130 F. Supp. 2d 610 (D.N.J. Feb. 2, 2001) ("*Bowers IV*"); *Bowers v. NCAA*, No. 97-2600, 2001 WL 1850089 (D.N.J. Feb. 6, 2001) ("*Bowers V*"); *Bowers v. NCAA*, No. 97-2600, 2001 WL 1772801 (D.N.J. July 3, 2001) ("*Bowers VI*"); *Bowers v. NCAA*, 151 F. Supp. 2d 526 (D.N.J. Aug. 6, 2001) ("*Bowers VII*"); *Bowers v. NCAA*, 171 F. Supp. 2d 389 (D.N.J. Nov. 7, 2001) ("*Bowers VIII*"), *rev'd in part by Bowers v. NCAA*, 346 F.3d 402 (3d Cir. 2003); *Bowers v. NCAA*, 188 F. Supp. 2d 473 (D.N.J. 2002) ("*Bowers IX*"), *rev'd in part, remanded by Bowers*, 346 F.3d 402; *Bowers v. NCAA*, No. 97-2600 (D.N.J. filed March 21, 2005) ("*Bowers X*") (dismissing the case). The underlying facts and events giving rise to the claims in this case are thus well documented.

Michael Bowers was a talented high school athlete with a learning disability. This learning disability was identified early on in his schooling as a "perceptual impairment" affecting his ability to achieve in spite of intellectual ability and interfering with his reading and writing skills.[1] Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 42 U.S.C.

---

[1]Bowers' IQ testing placed him in the above-average range; however, his specific learning disability affected his organization and processing skills. These deficiencies meant Bowers needed extra time to take tests, required help with study habits and organizational skills, and performed better in small group settings. Of the 24 classes Bowers took in high school, only three were in a regular academic setting.

§§ 1400 et seq., Bowers had an Individualized Education Program ("IEP") prepared for him by a team of state-certified psychologists and professional educators. Bowers' IEP provided for him to take the majority of his classes in a special education setting, and allowed him to take untimed standardized tests.

Bowers' difficulties in the classroom contrasted sharply with his prowess on the gridiron. As a high school football player in Palmyra, New Jersey, Bowers was recognized locally and regionally for his athletic achievements.[2] At some point between his junior and senior years, these achievements began to attract attention more widely from recruiters for prestigious college football programs around the country. Numerous schools, including the University of Iowa and Temple University ("Temple"), the two university Defendants in this case, contacted Bowers to explore the possibility of recruiting him. Throughout the recruiting process, Bowers received hundreds of recruitment-related letters and phone calls and was personally visited by numerous college recruiters. The institutions expressing an interest in Bowers were members of the National Collegiate Athletic Association ("NCAA"), the premier governing body of intercollegiate athletics in the United States.

The NCAA includes over 1,200 educational institutions grouped into different divisions determining the "scope of the

---

[2]Bowers lettered three years as a varsity football player, was first team "All Freedom Team" (conference wide team), and was first team "All South Jersey" and second team "All South Jersey" his junior and senior seasons respectively.

athletic program, the level of competition, and the amount of financial aid distributable through its athletic program." *Bowers II*, 9 F. Supp. 2d at 467. One of the NCAA's primary functions with respect to high school athletes is to determine whether an incoming college freshman will be academically eligible to participate in intercollegiate athletics. The NCAA has described the academic eligibility requirements as "designed to assure proper emphasis on educational objectives, to promote competitive equity among institutions and to prevent exploitation of student athletes." *Bowers I*, 974 F. Supp. at 466.

The eligibility determination depends on several factors, including whether the athlete graduated from high school, the athlete's high school grade point average ("GPA") in thirteen required "core courses," and the athlete's Scholastic Aptitude Test ("SAT") scores. The NCAA's definition of core courses specifically excludes special education classes taught below the high school's regular academic instruction level. (NCAA Bylaw 14.3.1.3). NCAA bylaws do provide, however, that special education courses for the learning disabled may satisfy the core course requirement if the student's high school principal submits a written statement to the NCAA indicating that students in such classes are expected to acquire the same knowledge, both quantitatively and qualitatively, as students in other core courses. (NCAA Bylaw 14.3.1.3.4). NCAA bylaws also provide for a waiver of eligibility requirements if the applicant submits objective evidence that demonstrates "circumstances in which a student's overall academic record warrants the waiver of the normal application of the requirements." (NCAA Bylaw 14.3.1.7). The NCAA contracts with ACT, Inc. to run the NCAA Initial-Eligibility Clearinghouse ("ACT/Clearinghouse"), which, as its name suggests,

determines whether potential student athletes are initially eligible to participate in college sports pursuant to NCAA regulations. ACT/Clearinghouse reviews applications submitted by prospective athletes and places an athlete into one of three categories: (a) qualifier, (b) partial qualifier, or (c) nonqualifier.

On September 13, 1995, Bowers submitted his application to ACT/Clearinghouse and after a series of correspondences with Bowers' high school throughout the 1995-96 school year, ACT/Clearinghouse issued its final certification report officially determining that Bowers was a nonqualifier for two primary reasons: (1) his special education courses did not satisfy the NCAA's core course requirement; and (2) he took an untimed SAT exam, and his application lacked documentation required to accept such untimed standardized test scores. *Bowers II*, 9 F. Supp. 2d at 469. Bowers alleges that this designation as a nonqualifier had extremely severe negative consequences. He lost the opportunity to receive an athletic scholarship, and was prohibited from practicing with or competing for any Division I or II football team his freshman year.[3] Even before Bowers was designated as a nonqualifier, Bowers alleges that Defendants University of Iowa and Temple discriminated against him upon learning of his special education curriculum, anticipating that he would be designated a nonqualifier by the NCAA as a result of that curriculum. *Id.* at 469-70. After

---

[3]Nonqualifier status also prohibits a student athlete from having any contact with an institutions's athletic team, including attending team meetings, access to the training staff, weight room activities, and team meals.

Bowers was officially designated as such, all recruiting efforts ended. *Id.* at 470.

Bowers nonetheless enrolled as a commuter student at Temple for the Fall 1996 semester. He did not take any classes at that time, however, because he was scheduled to undergo back surgery. Bowers did begin taking classes in the Spring 1997 semester, however, and did very well, making the Dean's List with a 3.63 GPA. Despite these promising developments, by the Fall 1997 semester, Bowers' academic and personal life had apparently begun to deteriorate. His grades declined during the Fall 1997 semester and he began treatment for depression, taking antidepressant medication prescribed by his family physician. In addition, by this time Bowers had begun abusing painkillers such as Percocet, Hydrocodone, and Tylenol with codeine that had originally been prescribed to him between Fall 1996 and 1997 to manage pain associated with a back injury. By the Spring 1998 semester, he had stopped attending classes. Although he enrolled for classes in the Fall 1998 semester, Bowers did not attend them and eventually dropped out of school altogether.

From the Fall of 1998 until mid-2001, Bowers was in and out of drug treatment and mental health programs and, in April 1999, was hospitalized after attempting to commit suicide. In 2002, however, Bowers showed some signs of recovery. He matriculated at American International College for the Spring 2002 semester, earned good grades, and participated in the spring football conditioning program in anticipation of joining the team for the fall semester. Sadly, any recovery efforts ended abruptly on June 2, 2002, when Bowers, home from school for the summer, died of an apparent drug overdose.

10

B.     Procedural History

While we have already explored the prior proceedings in this case at some length in a previous appeal, 346 F.3d 402 at 408-10, we are obliged to once again carefully wade into the thicket to disentangle the issues before us.  To be thorough, we review the entire proceedings; for the sake of brevity and clarity, however, we describe in detail only those aspects of the prior proceedings immediately relevant to our analysis.

On May 23, 1997, following his Spring 1997 semester at Temple, Bowers filed a complaint in the United States District Court for the District of New Jersey alleging, inter alia, that the NCAA and ACT/Clearinghouse had violated Titles II and III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12132, 12182, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), in their treatment of him.  After the District Court denied Bowers' motion for a preliminary injunction, *Bowers I*, 974 F. Supp. 459, he filed an amended complaint joining Temple, the University of Iowa, and American International College as defendants and adding state law claims under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §§ 10:5-1 – 10:5-49.

Defendants filed a motion to dismiss, or in the alternative, a motion for summary judgment.  The District Court dismissed the ADA claim against ACT/Clearinghouse because there was no evidence that it owned, leased, or operated a place of public accommodation, as required under Title III.[4]  *Bowers*

_____

[4]Title III of the ADA, 42 U.S.C. § 12181 et seq., prohibits discrimination against the disabled in the full and equal

*II*, 9 F. Supp. 2d at 481-83 (quoting 42 U.S.C. § 12182(a)). It also dismissed a Sherman Act claim against all of the Defendants on the basis of our opinion in *Smith v. NCAA*, 139 F.3d 180 (3d Cir. 1998), in which we held that "eligibility rules are not related to the NCAA's commercial or business activities" because "rather than intending to provide the NCAA with a commercial advantage, the eligibility rules primarily seek to ensure fair competition in intercollegiate athletics." *Id.* at 185. The District Court denied the motion in all other respects.

Thereafter, the parties engaged in discovery. Defendants then filed a motion for summary judgment. In a lengthy published opinion dated November 2, 2000, the Court granted summary judgment in favor of ACT/Clearinghouse on Bowers' Rehabilitation Act claim, finding that the record was clear that ACT/Clearinghouse did not receive federal funds. *Bowers III*, 118 F. Supp. 2d 494. The District Court also granted summary judgment in favor of ACT/Clearinghouse on Bowers' breach of contract claim.[5] It denied summary judgment in all other respects. In doing so, the Court rejected the argument of Temple and the University of Iowa that they had stopped recruiting Bowers for nondiscriminatory reasons, i.e., because he was undersized and not skilled enough to be a Division I

---

enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, 42 U.S.C. § 12184(a).

[5]The last remaining claim against ACT/Clearinghouse under the NJLAD was dismissed on August 6, 2001. *Bowers VII*, 151 F. Supp. 2d at 543.

12

lineman, finding that there were material issues of fact as to why the schools stopped recruiting him. *Id.* at 512-13.

On February 2, 2001, the District Court granted the NCAA's motion for reconsideration and granted summary judgment in favor of the NCAA and American International College on Bowers' Title III ADA claim. *Bowers IV*, 130 F. Supp. 2d 610. The Court concluded that Bowers was not entitled to injunctive relief because NCAA rules permitted partial qualifiers to gain a fourth year of eligibility.[6] As a result, since Bowers no longer had standing to seek injunctive relief – the only form of relief available under Title III – the Court dismissed his claim. *Id.* at 614.[7] A few days later, the District Court issued an opinion and order allowing Bowers to file a second amended complaint to: (1) clarify that he sought non-injunctive relief against Temple and the University of Iowa under the Rehabilitation Act and the ADA; and (2) to add three state law claims against the University of Iowa for promissory estoppel, equitable estoppel, and fraud. *Bowers V*, 2001 WL 1850089, at *3. The claims against the University of Iowa were

---

[6]Consequently, Bowers' period of potential eligibility was not any shorter than the period would have been had he been deemed an initial qualifier. Bowers' inability to gain a fourth year of eligibility was the sole basis upon which the District Court had previously determined that Bowers had standing to seek injunctive relief. *Id.* at 614.

[7]The Court also dismissed any claims for injunctive relief that Bowers could otherwise assert against the Defendants under the Rehabilitation Act. *Id.*

13

permitted to be added without prejudice to enable the University to develop an evidentiary record to support its argument that it was an "arm of the state" and thus entitled to Eleventh Amendment immunity. Following that discovery, on July 3, 2001, the District Court issued a decision finding that the University of Iowa was not an arm of the state and not entitled to sovereign immunity. *Bowers VI*, 2001 WL 1772801.

Another matter had arisen in the case involving third-party contribution. After the District Court's November 2000 summary judgment order, Temple filed a third-party complaint seeking contribution for any monetary liability it might have to Bowers from Delaware State University ("Delaware State"), University of Massachusetts-Amherst ("UMass-Amherst"), and University of Memphis ("Memphis"), schools that also had allegedly recruited Bowers. The third-party defendants brought motions to dismiss the complaint, arguing: (1) neither Title II of the ADA nor Section 504 of the Rehabilitation Act contemplate an award for contribution; (2) the universities had Eleventh Amendment immunity; and (3) Congress's purported abrogation and waiver of immunity in Title II of the ADA was unconstitutional.

On November 7, 2001, the District Court ruled on the third-party motions. *Bowers VIII*, 171 F. Supp. 2d 389. It granted in part and denied in part Memphis's motion, finding that Memphis was an arm of the State of Tennessee for Eleventh Amendment purposes and so Temple's contribution claim under the NJLAD state law claim against Memphis was barred by the doctrine of sovereign immunity. However, as to the federal claims, it found (1) there is a right of contribution under Title II of the ADA and Section 504 of the Rehabilitation Act,

14

(2) Congress validly abrogated Tennessee's Eleventh Amendment immunity under Title II of the ADA, and (3) Tennessee waived its Eleventh Amendment immunity under the Rehabilitation Act by accepting federal funds. The District Court did not make any other dispositive rulings on Eleventh Amendment issues, but instead ordered UMass-Amherst and Delaware State to submit additional briefing on these issues and granted Temple an opportunity to reply to this briefing.

Following briefing, the District Court subsequently held that: (1) Eleventh Amendment immunity barred Temple's claims for contribution against UMass-Amherst pursuant to NJLAD; (2) UMass-Amherst was not immune from contribution claims asserted under the ADA and Rehabilitation Act; (3) dismissal without prejudice was warranted with respect to claims for contribution under the NJLAD against Delaware State; (4) a stay pending Memphis's appeal from denial of sovereign immunity defenses was mandated; and (5) a certification for immediate, interlocutory appeal was warranted with respect to the Court's determination that a general right of contribution existed under the ADA and Rehabilitation Act. *Bowers IX*, 188 F. Supp. 2d 473.

On appeal, we did not reach the Eleventh Amendment issue, but rather concluded that there was not a right to contribution under Section 504 of the Rehabilitation Act and Title II of the ADA. 346 F.3d at 433. Even more importantly, for purposes of our present appeal, we rejected the University of Iowa's argument that we had pendent appellate jurisdiction to consider its untimely appeal of the District Court's Eleventh Amendment ruling. *Id.* at 412. We noted, however, that we likely would have to consider the Eleventh Amendment

15

argument eventually, but not until after a final judgment. *Id.* n.8.

The District Court had stayed all matters while the case was on appeal.[8] When the case returned from appeal, the parties thereafter engaged in further discovery heading toward a contemplated October 2004 trial date. On May 3, 2004, the parties entered into a confidentiality stipulation and protective order for plaintiff to disclose Michael Bowers' medical records.[9] On May 11, 2004, the scheduled date of Kathleen Bowers' deposition, attorneys for Bowers provided to Defendants for the first time some of Michael Bowers' medical records. Because these records showed for the first time that he had a preexisting drug condition that was not disclosed to Defendants, the District Court entered a series of orders directing Michael Bowers' medical providers to release all of his medical records. Upon release of these records, the full extent of Bowers' substance abuse and substance abuse treatment became apparent.

---

[8]During that period, two significant events occurred. First, as already related, Michael Bowers died on June 2, 2002, as a result of an apparent cocaine and heroin overdose. This was the first indication to Defendants that Bowers had any kind of drug problem. Second, the original district judge retired from the bench. The case was reassigned to District Judge Simandle, who inherited the procedural morass at the eleventh hour and was confronted with the difficult question of how to deal with the consequences of Bowers' non-disclosures.

[9]At this point in the dispute, the NCAA, Temple, and the University of Iowa remained as Defendants.

16

Thereafter, on October 15, 2004, Temple moved for sanctions, arguing that the case should be dismissed with prejudice as a sanction for Bowers' concealment of substance abuse and substance abuse treatment. It also moved for summary judgment, arguing that Bowers was not a qualified individual with a disability as a result of his drug use. The NCAA and the University of Iowa joined the motions.

The parties did not dispute that Bowers and attorneys for Bowers had failed to disclose information regarding Michael Bowers' substance abuse and his depression to Defendants until May 2004, nearly two years following his death. However, attorneys for Bowers argued that the discovery requests were narrow and they were therefore not required to seasonably amend them under Federal Rule of Civil Procedure 26(e)(2) to disclose treatment for alcoholism or depression. The District Court rejected this argument, and determined that Bowers' failure to disclose the information in a timely fashion was a willful one, in bad faith, and that it irreparably prejudiced Temple's ability to prepare a defense to Bowers' claims. *Bowers X*, No. 97-2600 (D.N.J. March 21, 2005).

The District Court further concluded that evidence of Michael Bowers' drug use was relevant not only to the issue of damages, but also to questions of liability. Consequently, the District Court entered a sanctions order pursuant to Federal Rules of Civil Procedure 37(c)(1) and 37(b)(2)(B). This sanctions order impaired Bowers' case in critical fashion. First, it precluded her from using any previously concealed information to support her claim that Defendants were liable for Michael Bowers' drug abuse and depression. Second, they precluded her from opposing Defendants' claim that Michael

17

Bowers' drug abuse rendered him unqualified to participate in intercollegiate athletics at all relevant times, which as a practical matter meant Defendants would be immune from liability.[10] *See* Order granting Motion for Joinder, granting Motion for Sanctions & granting Motion for Summary Judgment, No. 97-2600 (Simandle, J.) (March 21, 2005).

The District Court then considered Temple's renewed motion for summary judgment in light of the sanctions it imposed and concluded that Bowers was not a "qualified individual with a disability" under the ADA nor "otherwise qualified" under the Rehabilitation Act because his "drug use made him ineligible to compete for Temple or any other school." *Bowers X*, No. 97-2600, at 37-38. The Court granted the motion for joinder of the remaining Defendants and dismissed Bowers' case against all Defendants. The District Court did not reach the University of Iowa's motion for reconsideration on Eleventh Amendment grounds, dismissing the claim as moot.

Four parties filed timely appeals. Bowers filed an appeal from: (1) the March 21, 2005 Order granting defendant Temple's motion for sanctions against Bowers and Defendants' motion for summary judgment; and (2) the June 8, 1998 order

---

[10]To bring a claim under the ADA, a plaintiff must demonstrate she was "otherwise qualified" at the time of the allegedly unlawful discrimination. By precluding her from challenging Defendants' assertion that Michael Bowers was "unqualified" at the time of the allegedly unlawful discrimination, the sanctions thus effectively crippled Bowers' ability to establish a necessary element of her claim.

18

which dismissed with prejudice her Sherman Act claims with respect to all Defendants.[11] Bowers' attorneys, Barbara E. Ransom and Richard L. Bazelon, each separately filed an appeal from the sanctions portion of the March 21, 2005 order. Finally, the University of Iowa filed a cross-appeal from: (1) the March 21, 2005 order of the District Court dismissing as moot its renewed motion for summary judgment based on sovereign

---

[11]Bowers has waived this portion of her appeal, failing to formally present or even mention in passing the District Court's dismissal of her Sherman Act claims as an issue in her brief. *See* Federal Rule of Appellate Procedure 28; *see also Canady v. Crestar Mortgage Corp.*, 109 F.3d 969, 973-74 (4th Cir. 1997) (finding issue specified in notice of appeal but not mentioned in appellate brief was deemed waived); *Williams v. Chater*, 87 F.3d 702, 706 (5th Cir. 1996) (holding issues raised in notice of appeal but not briefed are deemed waived); *Cumberland Farms, Inc. v. Montague Econ. Dev. and Indus. Corp.*, 78 F.3d 10, 12 n.1 (1st Cir. 1996) (holding appellant waived issue raised in notice of appeal when it was not referred to in brief); *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 n.8 (8th Cir. 1994) (holding appellant waived issues that it raised in notice of appeal but failed to brief on appeal). However, we note that even if this issue were not waived, our decision in *Smith*, 139 F.3d at 185 ("[E]ligibility rules are not related to the NCAA's commercial or business activities" because "rather than intending to provide the NCAA with a commercial advantage, the eligibility rules primarily seek to ensure fair competition in intercollegiate athletics."), clearly precludes Bowers from sustaining Sherman Act claims in this case.

immunity; and (2) the July 3, 2001 order denying it immunity from Bowers' ADA, Rehabilitation Act, and NJLAD claims.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1337, 1343, and 42 U.S.C. §§ 12133, 12188, based on the federal claims asserted by Bowers. The District Court had supplemental jurisdiction over Bowers' state-law claims, pursuant to 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291 to hear this appeal from the final order of the District Court entering summary judgment on all claims.

## II. ANALYSIS

A.     The District Court's Grant of Summary Judgment

We begin our analysis with the issue of summary judgment because our disposition of this issue will help clarify our subsequent discussion of the preclusion sanctions ordered in this case. Our standard of review on an appeal from a grant of summary judgment is plenary, *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988), applying the same standard the District Court was required to apply. *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996) (citations omitted). That standard is provided by Federal Rule of Civil Procedure 56(c), which directs that summary judgment may be granted only when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In following this directive, we must take the facts in the light most favorable to the nonmoving party, Bowers, and draw all reasonable inferences in her favor. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 847 (3d Cir. 1996).

20

The District Court's summary judgment analysis in this case was fundamentally flawed in that it failed to focus on the correct time frame with respect to Defendants' liability. We have clearly stated that the determination of whether a person was a "qualified individual with a disability" for the purposes of an ADA claim[12] is not made from the time the lawsuit was filed or any other later time period, but from the point at which the alleged discriminatory decision was made. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006); *Gaul v. Lucent Techs.*, 134 F.3d 576, 580; *see also Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1035 (2d Cir. 1993). In this case, the allegedly discriminatory conduct occurred over the course of the Fall 1995-96 school year, during which time Bowers was deemed to be a nonqualifier and the defendant universities in this case allegedly stopped recruiting him for that reason.[13]

---

[12]Although the language of the ADA and Rehabilitation Act differs, the standards for determining liability under the two statutes are identical. *McDonald v. Pa. Dep't of Pub. Welfare*, 62 F.3d 92, 94 (3d Cir. 1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same.") (citation omitted). Similarly, we have held that the NJLAD relies on the same analytical framework as the ADA. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

[13]The NCAA itself recognized that the relevant time frame for determining whether Bowers was qualified to be a Division I football player was 1995-96. *See* Letter from NCAA Counsel to U.S. Magistrate Judge Rosen (May 26, 2004) ("The issue . . . is whether there was disability discrimination . . . that

21

The District Court had previously correctly identified Bowers' claims as stemming from alleged unlawful discrimination taking place in 1995-96. In its November 2000 summary judgment opinion, *Bowers III*, 118 F. Supp. 2d 494, the District Court recognized that the case turned on whether Bowers was discriminated against in 1995-96, when Bowers was a high-school senior and then a college freshman. *Id.* at 499 ("Bowers has . . . sued Temple University, the University of Iowa, and American International College for discrimination on the ground that these schools stopped recruiting Bowers to play football when they concluded that his learning disability would likely result in the NCAA declaring him a non-qualifier."); *id.* ("Bowers alleges that the NCAA discriminated against him because of his disability in declaring him ineligible to participate in intercollegiate athletics as a college freshman.").

Situating Bowers' claims in Fall 1995-96 and taking all reasonable inferences in Bowers' favor as the nonmoving party, we find there is a genuine issue of material fact as to whether Bowers was a "qualified individual with a disability" or "otherwise qualified," under the ADA and Rehabilitation Act, respectively. Furthermore, Michael Bowers' drug abuse does not preclude Bowers' claims. The evidence of any substance abuse in 1995-96 is minimal. Bowers apparently tried marijuana for the first time in 1991 at age 13 but appeared to use the drug infrequently. His last reported marijuana use was in July 1998, at which point he reported he had shared a "joint" five times

occurred in 1995-1996, when under the NCAA rules Bowers was deemed a 'non-qualifier.'") (emphasis in original).

22

over the past year.[14] There is no evidence that Bowers was taking any other illicit drugs in 1995-96. Bowers told counselors at Seabrook House that drugs did not become a problem for him until 1998. Dr. Carol Roberts, an expert retained by Bowers, stated in her report that: "In describing his own plunge into depression and addiction, Michael told me that in high school he had stayed away from drugs because he needed to be in top physical condition to play sports. He graduated in 1996, and at the end of 1998 while he was at Temple, he tried snorting cocaine with a friend." The record does indicate that Bowers began taking painkillers in Fall 1996. However, while Bowers acknowledged that he eventually became addicted to these painkillers, he began taking them on prescription, and after he was already denied initial eligibility and after recruiting efforts has ceased. Furthermore, there is no indication that he would have failed an NCAA drug test for ingesting prescription drugs. *See* NCAA policy 31.2.3.2.

All of the substance abuse evidence cited by the District Court, with the exception of the inconclusive marijuana-use evidence, pertained to the use of those substances after 1995-96, at which point Bowers' substance abuse was irrelevant for purposes of establishing liability in this case. In addition, Defendants' argument that Bowers was unqualified at the relevant time frame as a result of his drug abuse rests on the erroneous assumption that Defendants could have used evidence

---

[14]Temple's own counsel admitted at oral argument that there was no evidence that Michael Bowers used marijuana in his last year of high school, when he was seeking initial eligibility. (App. 275).

23

of Bowers' drug abuse as an after-the-fact justification for their allegedly discriminatory conduct. It is clear that the Defendants were completely unaware of Bowers' drug abuse at the time the allegedly unlawful discrimination took place in 1995-96 as well as during the time Bowers was at Temple. Indeed, that fact is the very source of the controversy with respect to the sanctions in this case. In turn, the Defendants "could not have been motivated by knowledge [they] did not have," *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360 (1995), and thus cannot now claim that Bowers was deemed a nonqualifier because of his drug abuse. *See also Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072 (3d Cir. 1995) (applying *McKennon* in unlawful discrimination context and holding after-acquired evidence of misconduct is relevant to damages but does not bar liability).

Thus, taking all reasonable inferences in Bowers' favor, we find genuine issues of material fact remain as to whether Bowers was a "qualified individual with a disability" at the relevant time period for establishing liability. The Defendants are therefore not entitled to judgment as a matter of law and, accordingly, we will reverse the District Court's grant of summary judgment.

B.      The District Court's Imposition of Preclusion Sanctions

Because we have concluded that the District Court's summary judgment analysis was erroneous for reasons independent of the order of sanctions in this case, we need not review the sanctions order under the standard set forth in *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863 (3d Cir. 1984) (setting forth a test to determine when a trial court's dismissal of a case pursuant to preclusion sanctions constitutes an abuse

24

of discretion).[15]  In this case, unlike in *Poulis*, the District Court did not specifically impose dismissal of the case as a sanction. Thus, based on our summary judgment ruling, even if the sanctions orders were entirely upheld, this would not result in a de facto dismissal of the case.  However, we find that certain aspects of the District Court's preclusion sanctions analysis rest on the same erroneous assumption as its summary judgment analysis – namely, that Bowers' alleged drug abuse was relevant for purposes of determining liability in 1995-96.  For this reason, as well as others discussed more fully below, we reverse, in part, the sanctions imposed.

The decision to impose sanctions for discovery violations and any determination as to what sanctions are appropriate are matters generally entrusted to the discretion of the district court. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639 (1976) (per curiam).  We therefore review a district court's decision to impose preclusion sanctions for abuse of discretion. *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 156 (3d Cir. 1995).  While this standard of review is deferential, a district

---

[15]In *Poulis*, we set forth six factors to be balanced in deciding whether to dismiss a case as a sanction:  (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense. *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984).

25

court abuses its discretion in imposing sanctions when it "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

The District Court found that Bowers and her attorneys had failed to fulfill their duty under Federal Rule of Civil Procedure 26(e) to supplement responses to discovery requests throughout the course of litigation.[16] More specifically, it found

---

[16]Rule 26(e) provides as follows:

(e) Supplementation of Disclosures and Responses. A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:

(1) A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. . . .

(2) A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material

26

that Bowers and her attorneys had willfully and in bad faith concealed from defense counsel evidence of Bowers' escalating substance abuse and substance abuse treatment. Therefore, in order to review this finding, it will be necessary to revisit the history of Bowers' substance abuse and depression treatment. As the District Court correctly perceived, "the history of Plaintiff's drug use is complex and convoluted but nevertheless central to the issues [in this case]." *Bowers X*, No. 97-2600, at 9.

Bowers tried marijuana for the first time in 1991 at age 13. It is unclear from the record how often he used it thereafter, but his last reported use, as already stated, infra, was in July 1998, at which point his use of that substance appeared to be intermittent. Between September 1996 and March 1997, after hurting his back lifting weights, Bowers was prescribed at least nineteen different painkillers, including Percocet, Hydrocodone, and Tylenol with codeine, to which he would eventually become addicted. By August 1998, Bowers had begun using heroin and cocaine. Approximately two months later, in October of the same year, he first began to seek help for his substance abuse, entering an intensive two-week inpatient drug rehabilitation program at Seabrook House. Located in Bridgeton, New Jersey, Seabrook House is a prominent inpatient drug and alcohol rehabilitation center.

---

respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.
Fed. R. of Civ. P. 26(e).

Following his inpatient program at Seabrook House, Bowers attended a daily outpatient drug treatment program, also administered by Seabrook House at a separate facility in Cherry Hill, N.J.. This program included therapy sessions with a non-physician drug counselor and a drug treatment program with a physician, Dr. Lance Gooberman, who, from June 4, 1999 until Bowers' death, treated him for his drug addiction with an experimental drug treatment program. Bowers also received inpatient treatment at Rancocas Hospital for bipolar disorder and polysubstance abuse from November 5, 1999 to November 26, 1999. In addition, Dr. Alan Rosenweig treated Bowers for depression and anxiety from December 7, 1999 to May 29, 2001, during which time Bowers was hospitalized after attempting to commit suicide. Bowers then underwent inpatient drug treatment on at least two more occasions at two separate facilities – at Bergen Regional Medical Center from March 10, 2000 to March 14, 2000, and at Zurbrugg Hospital in October 2000, followed by daily outpatient treatment from October 2000 until December 2001.

On August 7, 1998, Defendants served a set of interrogatories on Bowers, including Interrogatory 15, which asked Bowers to "[i]dentify all physicians or physical therapists who have treated or evaluated you from September 1, 1996 through the present date" and to "describe in detail the reason for that treatment." On October 28, 1998, in response to Interrogatory 15, Bowers identified two physicians who treated him during that time frame: Dr. Zeon Switenko (his family physician) and Dr. Benjamin Smolenski (an orthopedist). Bowers, who had just completed his two-week inpatient stay at Seabrook, did not mention that stay or indicate that any physicians treated him during his time there. Nor did he

28

supplement his answer to Interrogatory 15 at any time throughout the course of the litigation to reference, at the very least, Drs. Gooberman and Rosenweig.[17]

Interrogatory 19 of the August 7, 1998 interrogatories requested that Bowers, "with respect to damages . . . describe in detail each element of that relief; state all facts that provide the basis of that relief, including the amount, if any; and identify all documents relating or referring to each component of that relief, . . . and identify every individual with knowledge of the facts relating to those alleged damages or other relief." Bowers responded to Interrogatory 19 (under an objection), stating that he sought consequential damages for loss of scholarship and loss of career opportunities in the amount of $150,000.00, and compensatory damages for pain and suffering and emotional distress in the amount of $500,000.00. Additionally, Bowers stated that he could not compute punitive damages at that stage in the discovery process. Bowers did not identify any of the physicians who had treated him as "individuals with knowledge of the facts relating to those alleged damages or other relief." Defendants' First Request for Production of Documents also served on August 7, 1998, requested that Bowers produce "[a]ll documents identified in your answers to the interrogatories of all defendants in this litigation." Bowers did not produce any documents related to his treatment for substance abuse.

---

[17]The standard instructions to the interrogatories stated that the interrogatories were "continuing and any information secured subsequent to the filing of [the] answers, which would have been includable in the answers had it been known or available, is to be supplied by supplemental answers."

Bowers testified at his November 30, 1998 deposition that he became depressed after he was denied initial eligibility by ACT/Clearinghouse, and that he was prescribed two antidepressant medications by his physician, Dr. Switenko. Bowers was then asked: "Other than Dr. Switenko has any other physician treated you for depression?" Bowers answered "No." He was then asked if he had "ever seen another physician other than Dr. Switenko for treatment of anxiety?" Bowers answered "No" to that question as well. At his January 11, 1999 deposition, Bowers also denied receiving any treatment for depression since November 1998. Bowers did not disclose his stay at Seabrook or any subsequent treatment. Bowers also testified in his March 1999 deposition that he was unaware why he did not take any exams in the Fall 1998 semester, despite the fact that he had been recently discharged from inpatient drug treatment at Seabrook.

As already stated, Defendants claim that Bowers willfully failed to comply with discovery requests in violation of Rule 26(e). Important to note, however, is that the discovery requests in this case did not request information regarding Bowers' drug and alcohol addiction. Neither did Defendants make any explicit request for Bowers' medical records until March 15, 2004. Consequently, we believe there is some merit to Bowers' argument that she had no duty to turn over that information prior to an explicit request. We recognize that modern discovery rules, particularly Rules 26 and 37, were enacted to prevent civil trials in the federal courts from being "carried on in the dark." *Hickman v. Taylor*, 329 U.S. 495, 500 (1947); *see United States v. Procter & Gamble Co.*, 356 U.S. 677, 682-83 (1958) ("Modern instruments of discovery . . . together with pretrial procedures make trial less a game of blind man's bluff and more

30

a fair contest . . . .").  However, we agree with Bowers that the duty of supplementation under Rule26(e)(2) "does not require that a party volunteer information that was not encompassed within the scope of an earlier discovery request."  *Polec v. Northwestern Airlines, Inc.*, 86 F.3d 498, 539 (6th Cir. 1996).

However, the interrogatories do plainly request information on "all physicians or physical therapists that have treated [Michael Bowers]."  The District Court was clearly correct in finding that the failure by Bowers and attorneys for Bowers to turn over information regarding his subsequent treatments with physicians for drug addiction from Fall 1998 until his death was willful and in bad faith.  Bowers did not disclose any of the doctors that treated him at Seabrook, Bergen Regional Medical Center, or Zurbrugg Hospital.  Nor did he disclose that he had been treated by Drs. Gooberman and Rosenweig.  It is simply inconceivable that Bowers and counsel for Bowers could not have recognized their obligation to disclose treatment by these physicians given the clarity of Defendants' discovery request for the information on "all physicians."

Moreover, the disclosure of this treatment clearly would have led to discoverable information.  It is virtually certain that Defendants would have learned of Bowers' drug use had he disclosed his treatment with Dr. Gooberman.  Dr. Gooberman was well-known for prescribing a controversial subcutaneous "pellet treatment" program for patients suffering from severe heroin addictions.  In fact, Gooberman's office letterhead states clearly that he specializes in "addiction medicine."  While Bowers is correct that Defendants did not explicitly ask for medical records or information about possible drug addiction,

31

had Bowers complied with her discovery obligations, Defendants might have learned about Bowers' drug use as early as October 1998. Indeed, following that crucial thread of information, Defendants would have been able to uncover Bowers' past drug use prior to his death and depose him on the subject.[18] Instead, that opportunity eluded them for four years as Bowers failed to disclose his course of substance abuse treatment with multiple physicians. Allowing any information regarding Bowers' substance abuse to be introduced posthumously by Bowers for her own advantage would thus be patently unfair to Defendants, who were clearly blind-sided by that evidence. As a result, we find the District Court did not abuse its discretion in issuing preclusion sanctions with respect to Bowers' drug use.

However, we find it was an abuse of discretion for the District Court to preclude Bowers from introducing any evidence of his depression. Unlike Bowers' drug problems, which would have been readily revealed had he disclosed his treatment with Dr. Gooberman, Defendants were not blind-sided by evidence that Bowers had suffered from depression. Bowers was forthright about his depression from the outset. Bowers' initial Rule 26 disclosures requested "punitive damages for the

---

[18]We reluctantly agree with Bowers that there is scant evidence in the record as to whether Michael Bowers was treated by any physicians at Seabrook, Bergen Medical Center, or Zurbrugg Hospital. However, we find it difficult to imagine that Bowers was not treated by a single physician during his multiple inpatient hospital stays, including one for an attempted suicide.

pain and suffering that [sic] the trauma of not being able to achieve his goal to play college football and the advantages that ensue therefrom . . . ." Bowers responded to Defendants' interrogatory requests that he sought consequential damages from loss of scholarship and career opportunities in the amount of $150,000.00, and compensatory damages for pain and suffering and emotional distress in the amount of $500,000.00. Temple recognized this damage claim to be based upon Bowers' depression, noting that in Bowers' Rule 26 disclosures "[p]rincipally, he claimed to have been suffering from depression." Mem. of Law in Supp. of Mot. for Sanctions of Def. Temple University at 3. Defendants' consolidated brief further acknowledges that Defendants were previously aware of Bowers' depression. Consol. Br. for Appellees at 14 ("Bowers limited his emotional distress claims solely to depression from not being able to play NCAA Division I football."). Defendants also recognized in their consolidated brief that they had "focused on [Bowers'] claim of depression during his January 11, 1999 deposition," and that "depression was the only emotional harm he identified under repeated questioning." *Id.* at 15, 18.

While Bowers' depression certainly may have become aggravated by and intertwined with his drug abuse at some point, we believe the two can be disentangled for purposes of establishing damages in this case. Indeed, Bowers' depression has been a centerpiece of his claims for damages from the inception of this case, long before the clear onset of any substance abuse problems. Consequently, we conclude the District Court's blanket preclusion of evidence related to depression reflects a "clearly erroneous assessment of the evidence in record" and was thus an abuse of discretion. *Cooter*

33

*& Gell*, 496 U.S. at 405. We will therefore affirm the sanctions order of the District Court only insofar as it precludes Bowers, in proving damages, from using evidence of his drug abuse and drug abuse-related depression.

Furthermore, we reverse the sanctions order insofar as it precludes Bowers from opposing Defendants' claim that Michael Bowers' drug abuse rendered him unqualified to participate in a program of intercollegiate athletics at all relevant times. That aspect of the sanctions order, again, reflects a failure on the part of the District Court to correctly focus on the time frame of 1995-96 as the relevant time period for evaluating the claims in this case. As elaborated more fully in our discussion of the District Court's summary judgment analysis, infra Part II.A, 1995-96 is the time period in which the NCAA allegedly unlawfully discriminated against Bowers by denying him initial eligibility. This is also the time period during which Bowers alleges the university Defendants participated in that allegedly unlawful discrimination. This is therefore the relevant time frame for purposes of establishing liability.

The District Court's failure to focus on this period led to a clearly erroneous assessment of the relevance of Bowers' post-1995-96 drug abuse and concealment of that abuse. The Court concluded that "evidence of record thus shows that Michael Bowers' pattern of substance abuse involving painkillers, heroin and other drugs, originally hidden, precluded his participation in intercollegiate athletics at all relevant times." *Bowers X*, No. 97-2600, at 41. However, at the relevant time for purposes of establishing Defendants' liability, 1995-96, the record is devoid of any evidence that Bowers was addicted to painkillers or had begun using cocaine and heroin. There is no evidence that this

34

drug abuse began until after the relevant time period – after Bowers had been denied initial eligibility and after the university Defendants had stopped recruiting him.[19] Thus, the District Court's conclusion that Bowers' drug abuse was relevant to the issue of liability is clearly erroneous and we reverse that part of its order precluding Bowers from opposing Defendants' claim that Michael Bowers' drug abuse rendered him presumptively unqualified in Fall 1995-96.

C.      Separate Appeal of Attorneys for Bowers with Respect to Sanctions Order

As a threshold matter, we must determine whether attorneys for Bowers have standing to appeal the sanctions order in this case. Standing is the "irreducible constitutional minimum" necessary to make a justiciable "case" or "controversy" under Article III, § 2. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The sanctions order in this case clearly granted Temple's sanctions motion against Bowers, but did not impose any additional monetary or disciplinary

---

[19]In addition, the Defendants' argument that they were substantially prejudiced by this concealment with respect to defending against liability is undermined by the logic of *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360 (1995) (finding employer could not have been motivated by knowledge it did not have and claim that an employee was fired for a nondiscriminatory reason), and *Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072 (3d Cir. 1995) (applying *McKennon* in unlawful discrimination context and holding after-acquired evidence of misconduct is relevant to damages but does not bar liability).

sanctions on Bowers' attorneys beyond factual findings and language in the actual order that the conduct of those attorneys merited sanctions. Defendants argue that because the District Court did not impose any monetary penalty directly against counsel, but rather limited the sanction to precluding plaintiff from introducing and challenging certain evidence that was withheld under Rule 37, attorneys for Bowers have not suffered a cognizable "injury" to establish Article III standing. *Id.*

We have previously stated that "an attorney subjected to a sanction may appeal." *Bartels v. Sports Arena Employees Local 137*, 838 F.2d 101, 104 (3d Cir. 1988). However, a review of the case law on this question reveals some disagreement among the courts of appeals as to whether and when a court's statement in a judicial opinion amounts to a sanction "affecting an attorney's professional reputation" and thus "impos[ing] a legally sufficient injury to support appellate jurisdiction." *Butler v. Biocore Med. Techs., Inc.*, 348 F.3d 1163, 1167-68 (10th Cir. 2003). Most courts agree that mere judicial criticism is insufficient to constitute a sanction. *United States v. Talao*, 222 F.3d 1133, 1138 (9th Cir. 2000); *Williams v. United States*, 156 F.3d 86, 90 (1st Cir. 1998); *Bolte v. Home Ins. Co.*, 744 F.2d 572, 573 (7th Cir. 1984).

In addition, courts are in near complete agreement that an order rising to the level of a public reprimand is a sanction. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988) (noting ability to issue a formal reprimand of attorney for violating Federal Rule of Criminal Procedure); *Talao*, 222 F.3d at 1138 (equating formal finding with public reprimand and sanction); *Williams*, 156 F.3d at 91, 92 ("Words alone may suffice [as sanctions] if they are expressly identified as a

36

reprimand."); *Walker v. City of Mesquite, Tx.*, 129 F.3d 831, 832 (5th Cir. 1997) (finding appealable sanction where attorneys were "reprimanded sternly and found guilty of blatant misconduct"); *United States v. Horn*, 29 F.3d 754, 758 n.1 (1st Cir. 1994); *see also* Fed. R. Civ. P. 11(c)(2) (providing, inter alia, that sanctions may consist of "directives of a nonmonetary nature"). The reason for the courts' consensus is that a public reprimand carries with it the formal censure of the court and may, in many cases, have more of an adverse effect upon an attorney than a minimal monetary sanction. *See*, *e.g.*, *Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1353 (Fed. Cir. 2003). Only the Seventh Circuit has clearly held that a public reprimand not accompanied by a monetary sanction is non-appealable. *Clark Equip. Co. v. Lift Parts Mfg. Co., Inc.*, 972 F.2d 817, 820 (7th Cir. 1992) ("[W]e have already decided that an attorney may not appeal from an order that finds misconduct but does not result in monetary liability, despite the potential reputational effects.").

There is more substantial disagreement among the courts, however, as to whether a factual finding in an opinion that an attorney has engaged in improper conduct is in itself a sanction, or whether the court must enter an explicit order that the conduct is sanctionable. *Compare Precision Specialty Metals, Inc.*, 315 F.3d at 1353 (stating fact that reprimand not explicitly contained in separate order was not determinative in whether the court has entered a formal reprimand), *and Walker*, 129 F.3d at 832 (factual finding of misconduct alone sufficient to constitute sanction), *and Sullivan v. Comm. on Admissions and Grievances*, 395 F.2d 954, 956 (D.C. Cir. 1967) (same), *with Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1199 (9th Cir. 1999) (stating that a factual finding in an opinion that "merely

37

serves to justify the imposition of a sanction is not an independent sanction"); *Williams*, 156 F.3d at 90 (same); *The Baker Group, L.C. v. Burlington Northern and Santa Fe Ry. Co.*, 451 F.3d 484 (8th Cir. 2006).[20]  We need not examine that dichotomy in great detail in this case because both the order and opinion issued by the District Court in this case explicitly stated that the Court was sanctioning not only Bowers but also her attorneys.

The sanctions order entered by the District Court states, in pertinent part, as follows:

It is this 21st day of March, 2005 hereby

---

[20]The First Circuit's approach (adopted by the Ninth) in determining whether nonmonetary verbal admonitions constitute a sanction focuses on whether the judicial criticism is expressly designated in the order as a formal reprimand:

> Let us be perfectly clear.  Sanctions are not limited to monetary imposts.  Words alone may suffice if they are expressly identified as a reprimand.  But critical comments made in the course of a trial court's wonted functions – say, factfinding or opinion writing, do not constitute a sanction and provide no independent basis for an appeal.

*Williams v. United States*, 156 F.3d 86, 92 (1st Cir. 1998); *see also Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194 (9th Cir. 1999) (stating that a disparaging comment that merely serves to justify the imposition of a sanctions order is not an independent sanction).

> ORDERED that Defendant Temple University's motion for sanctions against Plaintiff *and Plaintiff's counsel Barbara E. Ransom, Esq. and Richard L. Bazelon, Esq.* [Docket Item No. 301-1] shall be, and hereby is, GRANTED;

Order granting Motion for Joinder, granting Motion for Sanctions & granting Motion for Summary Judgment, No. 97-2600 (March 21, 2005) (emphasis added).

In addition, on several occasions in its opinion, the District Court made findings that these attorneys wilfully failed to disclose information to Defendants in bad faith, concluding that "the actions of Plaintiff's counsel rise above a mere lack of due diligence, to the level of bad faith." *Bowers X*, No. 97-2600, at 32.

We find the weight of authority supports a finding that the repeated, explicit public reprimand of the attorneys in this case constitutes an appealable sanction. *See Young v. City of Providence*, 404 F.3d 33, 38 (1st Cir. 2005) (finding a sanction where the district court explicitly imposed "the sanction of public reprimand"); *Precision Specialty Metals, Inc.*, 315 F.3d at 1352-53. In similar cases, courts have concluded that express findings that a party violated a particular rule of civil procedure constituted a sanction. *See Young*, 404 F.3d at 38 (finding sanction where the district court stated that attorney violated Rule 11); *Precision Specialty Metals, Inc.*, 315 F.3d at 1352-53 (same); *Butler*, 348 F.3d at 1168 (explicit finding that attorney violated state ethical rule was a sanction); *Talao*, 222 F.3d at 1138 (same); *Walker*, 129 F.3d at 832 (same). The order here clearly rose above mere judicial criticism. The District Court concluded not only that the attorneys violated Rule 26(e), but

39

also entered a public reprimand by explicitly granting the sanctions motion against Bowers' attorneys. For these reasons, we agree with attorneys for Bowers that the sanctions order in this case is an appealable order.

We also agree that the District Court violated the procedural due process rights of attorneys for Bowers in this case. "Whenever the district court imposes sanctions on an attorney, it must at a minimum, afford the attorney notice and opportunity to be heard." *Weissman*, 179 F.3d at 1198 (finding that the district court violated attorney's due process rights by failing to give him notice and an opportunity to be heard prior to sanctioning him); *see also In re Ruffalo*, 390 U.S. 544, 550 (1968) (stating that attorneys subject to disciplinary proceedings are entitled to procedural due process protections, including fair notice of charges). It is clear that attorneys for Bowers had no notice whatsoever that the District Court was contemplating entering sanctions against them prior to the hearing on Temple's motion. Temple's original sanctions motion requested sanctions against plaintiff, not plaintiff's counsel,[21] and the purpose of the hearing was to determine whether sanctions imposed against plaintiff were warranted. Until the District Court's opinion and order was filed, attorneys for Bowers had no idea that the Court was even considering levying sanctions against them. Under these facts, the District Court violated these attorneys' rights to procedural due process.

Accordingly, we reverse the sanctions order of the District Court issued against attorneys for Bowers and remand

---

[21]The sanctions motion stated that Temple "hereby moves for sanctions against plaintiff Kathleen Bowers."

to give the attorneys an opportunity to be heard before any further sanction is entered.

D.     The University of Iowa's Eleventh Amendment Sovereign Immunity Challenge[22]

At the outset, we must state that it is clear that the University of Iowa is not entitled to Eleventh Amendment immunity as to its Rehabilitation Act claims. The University of Iowa's argument with respect to that claim has been foreclosed by our decision in *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 168-76 (3d Cir. 2002), in which we held that a state program or activity that accepts federal funds waives its Eleventh Amendment immunity to Rehabilitation Act claims. In this case, the University of Iowa clearly "concedes it and its students receive federal funds for purposes of Section 504." Br.

---

[22]We should clarify that Temple does not raise this issue. We also note that in our previous dismissal of the University of Iowa's appeal from the District Court's order of July 3, 2001, we reserved judgment on the University of Iowa's immunity claims. *Bowers v. NCAA*, 346 F.3d 402, 412 n.8 (3d Cir. 2003). Specifically, we recognized that "depending on the future course of this litigation we may have to entertain Iowa's Eleventh Amendment arguments following final judgment." *Id.* The District Court's March 21, 2005 order is a final judgment for purposes of 28 U.S.C. § 1291 and we exercise jurisdiction accordingly. However, as the District Court's opinion and order of March 21, 2005, did not address the University of Iowa's sovereign immunity claim on the merits, we consider the Court's July 3, 2001 decision on the merits as a touchstone for our own analysis.

41

for Appellee/Cross Appellant University of Iowa at 6. Thus, even if the University is an arm of the state, it has waived its Eleventh Amendment immunity for Rehabilitation Act claims, and Bowers' Rehabilitation Act claim will remain. As a result, we will focus our analysis on the issue of whether the University of Iowa is an "arm of the state" of Iowa for the remaining state law claims and the Title II ADA claim.

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although the language of the Eleventh Amendment refers only to "States," the Supreme Court has held that the immunity extends to entities that are considered arms of the state. *See Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 (1997); *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984).

A state entity is properly characterized as an arm of the state and thus "entitled to immunity from suit in a federal court under the eleventh amendment when a judgment against it 'would have essentially the same practical consequences as a judgment against the State itself.'" *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)). We have adopted a three-part test to apply in order to determine whether an entity is an arm of the state for Eleventh Amendment purposes. That test examines the following three elements: (1) whether the payment of the judgment would come from the state; (2) what status the entity

42

has under state law; and (3) what degree of autonomy the entity has. *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir. 2006) (citing *Fitchik*, 873 F.2d at 659).[23]

In the past, we have afforded some prominence to the first factor, the so-called "funding prong," i.e., whether payment comes from the state treasury. *Fitchik*, 873 F.2d at 659 ("Although no single *Urbano* factor is dispositive, the most important is whether any judgment would be paid from the state treasury.") (citing *Urbano v. Bd. of Managers*, 415 F.2d 247 (3d Cir.1969)) . More recently, however, in *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233 (3d Cir. 2005), we held that "we can no longer ascribe primacy to the first factor," concluding that it was relegated "to the status of one factor co-equal with others in the immunity analysis." *Id.* at 239-40.[24] Accordingly, each of

---

[23]We refer to these three factors as the "*Fitchik* factors."

[24]That holding was necessitated by the Supreme Court's decision in *Regents of the University of California v. Doe*, in which the Court stated that whether an entity is an arm of the state for Eleventh Amendment purposes is not merely a "formalistic question of ultimately financial liability." 519 U.S. 425, 431 (1997). The relevant inquiry is "the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance." *Id. See also Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765 (2002) ("While state sovereign immunity serves the important function of shielding state treasuries . . . the doctrine's central purpose is to accord the States the respect owed them as joint sovereigns.").

43

the factors must be considered equally in this case in assessing whether the University of Iowa is an arm of the state for Eleventh Amendment purposes.[25]

Whether a public university is entitled to Eleventh Amendment immunity is a fact-intensive review that calls for individualized determinations. Although we have held in the past that the Pennsylvania System of Higher Education was entitled to Eleventh Amendment immunity, *Skehan v. State System of Higher Educ.*, 815 F.2d 244 (3d Cir. 1987), we have also held that Rutgers, the State University of New Jersey, was not. *Kovats v. Rutgers, The State Univ.*, 822 F.2d 1303, 1312 (3d Cir. 1987). With this in mind, we proceed to examine each of the *Fitchik* factors with respect to the particular relationship between the State of Iowa and the University of Iowa.

1. The State of Iowa is not obligated to pay a judgment against the University

The funding prong of *Fitchik* requires us to determine whether the payment of any judgment against the University of Iowa would come from the public treasury of the State of Iowa, i.e., whether the State is legally liable to pay the judgment. *See Regents of the Univ. of Ca. v. Doe*, 519 U.S. at 431. In making this determination, we "consider as a critical factor whether any judgment rendered against the entity would ultimately come out of state funds." *Edelman v. Jordan*, 415 U.S. 651, 668 (1974). The District Court determined that the first factor weighed

---

[25]The party asserting that it is entitled to sovereign immunity has the burden of production and persuasion. *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).

44

against affording the University immunity because: (1) the State of Iowa was not the predominant source of the funds for the University, as only 21% of the University's funding came from the State; (2) the State did not proclaim itself legally obligated to assume responsibility for the University; and (3) the University maintained its own funding sources independent from the state treasury. *Bowers VI*, 2001 WL 1772801, at *3.

The University argues that it will be required to pay indirectly any judgment against it because the State of Iowa will be required to increase appropriations to the University to compensate for the judgment. The appropriate question to ask, however, is whether the State is *obligated* to pay or reimburse the University for its debts. *See*, *e.g.*, *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 51 (1994) ("If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise?"). As we recently explained in *Febres* in rejecting a similar indirect liability argument, if a State is not under a legal *obligation* to satisfy a judgment, then any increase in expenditures in the face of an adverse judgment is considered a voluntary or discretionary subsidy not entitled to Eleventh Amendment protections. *Febres*, 445 F.3d at 234. *See also Fitchik*, 873 F.2d at 661 (noting that New Jersey law provided that any increase in transit agency's state appropriation as a result of a judgment against the agency was deemed discretionary action by the State); *Kovats*, 822 F.2d at 1309 (stating that under state law, Rutgers retained sole discretion

45

over its accounts and New Jersey law explicitly insulated itself from any liability on obligations running against Rutgers).[26]

The University of Iowa argued before the District Court that Iowa Code § 8.32 demonstrates that the State of Iowa is obligated to pay for any outlay of funds necessary to pay Bowers' judgment. That section states that "[a]ll appropriations made to any department or establishment of the government as receive or collect moneys available for expenditure by them under present laws, are declared to be in addition to such repayment receipts, and such appropriations are to be available as and to the extent that such receipts are insufficient to meet the costs of administration, operation, and maintenance, or public improvements of such departments." Iowa Code § 8.32. Translating this code into plainer English, the University of Iowa has argued that § 8.32 merely reveals that state appropriations are available to meet expenditures when the receipts are insufficient. The District Court, however, determined that the code section does "not reveal an obligation on the part of the state beyond that which has already been appropriated" because the section "merely establishes that the

---

[26]Our focus can be distinguished from *Brine v. Univ. of Iowa*, 90 F.3d 271, 275 (8th Cir. 1996) (holding University of Iowa entitled to immunity) and *Van Pilsum v. Iowa State Univ. of Sci. and Tech.*, 863 F. Supp. 935 (S.D. Iowa 1994) (holding Iowa State entitled to immunity), in which the courts considered the effect of a judgment on the state treasury, including whether it would cause the State to increase expenditures. As we follow a different approach, those cases are inapposite with respect to the funding prong.

46

state appropriations previously allocated are available after an entity has exhausted the revenues it receives from non-state sources." *Bowers VI*, 2001 WL 1772801, at *3. We find that interpretation is plausible, although the code section is not entirely clear. However, we do not believe any further tortured parsing of the language of § 8.32 will be productive and we resist "convert[ing] the inquiry into a formalistic question of ultimate financial liability." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. at 431.

Therefore, while we find the first *Fitchik* funding factor may tilt the scale against immunity because statutory language does not clearly obligate the State of Iowa to pay the University's debts, it is certainly not dispositive of the ultimate outcome in our analysis.

> 2. The University is considered an arm of the state under Iowa state law

The second *Fitchik* factor requires that we focus on whether the State itself considers the entity an arm of the state. Under the second factor, we look to how state law treats the entity generally; whether the entity can sue or be sued in its own right, whether the entity is separately incorporated, and whether the entity is immune from state taxation. *Febres*, 445 F.3d at 230.

This second factor clearly weighs in favor of immunity. The University was created under the Iowa state constitution, it is the only constitutionally created university in the State, and it

47

has not been separately incorporated by the State.[27]  The Iowa Constitution further provides that the "educational and school funds and lands[] shall be under the control and management of the General Assembly of this State."  Iowa Const. Art. IX, 2d. § 1.  University real estate is owned in the State's name and the University is unable to buy or transfer real estate without the express permission of a State Executive Council.  Iowa Code § 262.9.  Most importantly, Iowa state law considers the University to be a state agency.  *Sindlinger v. Iowa St. Bd. of Regents*, 503 N.W. 2d 387 (Iowa 1993).  *Compare Febres*, 445 F.3d at 233 (noting that N.J. state law generally treated school boards as separate political subdivisions) *with Benn*, 426 F.3d at 233 (stating that under the Pennsylvania Supreme Court's interpretation of the state constitution, county judicial districts are state entities).

In addition, although the University may bring suit in its own name, it may do so only through the State Attorney General's Office, which also is obligated to defend the University from suit.  Iowa Code § 13.2.  Furthermore, unlike New Jersey's tort claims act, which applies to New Jersey counties and municipalities as well, *see Fitchik*, 873 F.2d at 663, Iowa has separate tort claims acts for the State (Iowa Code ch. 699) and political subdivisions (Iowa Code ch. 670).

---

[27]Article IX, Section 11 of the Iowa Constitution states that "The State University shall be established at one place without branches at any other place, and the University fund shall be applied to that Institution and no else."  Iowa Const. Art. IX, § 11.

These facts sufficiently establish that the University of Iowa is considered an arm of the state by the State of Iowa.

>   3.    The University's autonomy is constrained by state authority

The final *Fitchik* factor focuses on the degree of independence from state control an entity exercises. The Board of Regents of the University of Iowa is tightly constrained by state authority. The Board of Regents, which governs the University of Iowa and all other state universities, consists of nine members, each appointed by the governor for a six-year term (with the restriction that no more than five may be from the same political party). Iowa Code. § 262.1, .2, .7. The governor of Iowa is entitled to remove a member of the board for cause with the approval of a majority of the senate, Iowa Code § 262.5, and the governor may suspend a board member when the general assembly is not in session. Iowa Code § 262.5. Board expenses are reimbursed by the state director of revenue, Iowa Code § 262.29, who must report to the governor the amount paid in services and expenses of officers and employees of the board. Iowa Code § 262.22. The Board's powers are further regulated by Iowa Code § 262.9, which governs, inter alia, the Board's procurement specifications of certain types of materials (e.g., the department of natural resources must review the Board's procurement specifications to ensure that the Board purchases recyclable materials and soybean-based inks), the University's acquisition and disposal of real estate, the University's ability to accept and administer trusts, and the number of University meetings and locations that may be held. The Board may only acquire or transfer real estate with the approval of the State Executive Council, which consists of the

Governor, State Auditor, State Treasurer, Secretary of State, and Secretary of Agriculture. Iowa Code § 262.9(7). *Contra Fitchik*, 873 F.2d at 663 (noting that under New Jersey law the New Jersey Transit was able to purchase and sell property without any state governmental oversight). The Board is authorized to secure patents and copyrights from students, instructors and officials, but they must become the property of the State. Iowa Code § 262.9(11). Biennially, the Board is required to give an expenditures report to the governor and the legislature and to submit a biennial budget. Iowa Code § 262.26. In addition, the University is required to hire a budget analyst to serve as a liaison between the State Department of Management and the University in preparing the budget, Iowa Code § 8.29, and is required to report monthly expenditures and receipts of funds to the state director of revenue and finance.

In light of these facts, is it apparent that the University of Iowa is tightly controlled by the State of Iowa.[28] Therefore, we find the autonomy factor weighs in favor of Eleventh Amendment immunity.

4.      Weighing the factors

Summing up, the first *Fitchik* factor weighs slightly against immunity, while the second and third factors weigh

---

[28]By contrast, in *Kovats*, the New Jersey governor had the power to appoint some of the board members to Rutgers, and there were only two limitations on the board's operation of University: the board had to comply with (1) state budget appropriations; and (2) with state laws and regulations. *Kovats*, 822 F.2d at 1312.

heavily in favor of immunity. The District Court placed great emphasis on the funding prong in accordance with our pre-*Doe* jurisprudence. Under current precedent, however, we are required to consider each of the factors equally when determining whether an entity is entitled to Eleventh Amendment immunity. *Benn*, 426 F.3d at 233.

In this case, we believe the overwhelming degree of state involvement in the University of Iowa warrants a finding that the University is an arm of the state. While the State of Iowa is not clearly obligated by statute to increase expenditures to the University as a result of an adverse judgment, there is a high degree of state involvement in the affairs of the Board of Regents and the University in general. In addition, under Iowa law the University is clearly considered an arm of the State. Accordingly, we find that the University of Iowa is entitled to Eleventh Amendment immunity with respect to Bowers' state law tort claims.

E. Congress validly abrogated Eleventh Amendment immunity under Title II of the Americans with Disabilities Act.

Having determined that the University of Iowa is entitled to sovereign immunity, we are required to consider the applicability of that doctrine to Title II of the ADA. The United States, as intervenor, reminds us that judicial restraint requires us to "avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988). In order to avoid the constitutional question in this case, the United States suggests we in effect prune away Bowers' Title II claim, as Section 504 of the Rehabilitation Act provides nearly identical

51

protection. While we do not disagree that the protections afforded by Title II and Section 504 are substantially similar, *see Doe v. Cty. of Centre*, 242 F.3d 437, 447 (3d Cir. 2001), we do not believe that prudence in the form of constitutional avoidance warrants abrogating Bowers' right to bring a claim under Title II. As our reversal of the District Court's order of summary judgment has revived Bowers' Title II claim, we are squarely presented with the constitutional question regarding that statute's purported abrogation of sovereign immunity. Thus, prudential concerns notwithstanding, we feel obliged to enter the fray. *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (passing on a constitutional question is "a necessity in the determination of [a] real, earnest, and vital controversy between individuals").

In order for Congress to validly abrogate state sovereign immunity, Congress must: (1) unequivocally express its intent to abrogate that immunity; and (2) act pursuant to a valid grant of constitutional authority. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000). The first prong of this test is easily satisfied in this case, as Title II of the ADA provides that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation." 42 U.S.C. § 12101(b)(4); *see generally Board of Trustees of Univ. of Ala. v. Garrett* 531 U.S. 356 (2001) (finding that the above statutory provision was an unequivocal expression of Congressional intent to abrogate state sovereign immunity under Title II). Our task then in this case is to determine whether Congress exceeded its authority under § 5 of the Fourteenth Amendment in purporting to abrogate state sovereign immunity under Title II of the ADA with respect to public education.

"Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." *Tennessee v. Lane*, 541 U.S. 509, 518 (2004). Under this "broad enforcement power," *id.*, Congress may "enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 727-28 (2003) (concluding that the Family Medical Leave Act is a valid exercise of Congress's § 5 power to combat unconstitutional sex discrimination). "When Congress seeks to remedy or prevent unconstitutional discrimination, § 5 authorizes it to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause." *Lane*, 541 U.S. at 520. Thus, Congress's § 5 authority can sweep in conduct that may possibly be constitutional. *See City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) ("Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into the 'legislative spheres of autonomy previously reserved to the States.'") (citation omitted).

Although Congressional authority under § 5 is broad, it is not unlimited. *Lane*, 541 U.S. at 520. The key limitation is that Congressional action must not work "a substantial change in the governing law." *City of Boerne*, 521 U.S. at 519. In this respect, the Supreme Court has established a "congruence and proportionality" test: "Section 5 legislation is valid if it exhibits 'a congruence and proportionality between the injury to be

53

prevented or remedied and the means adopted to that end.'" *Lane*, 541 U.S. at 520 (quoting *City of Boerne*, 521 U.S. at 520). The Court has enacted a three-step inquiry to determine whether a particular statute satisfies the congruence and proportionality test, which requires the parties to identify: (1) with some precision the constitutional right at issue; (2) whether Congress identified a history and pattern of unconstitutional discrimination by the States against the disabled; and (3) whether the rights and remedies created by the statute are congruent and proportional to the constitutional rights it purports to enforce and the record of constitutional violations adduced by Congress. *Garrett*, 531 U.S. at 365, 368, 372-73.

For example, the purported abrogation of Title I of the ADA failed that test in *Garrett*, in which the Court held that there was not a pattern of constitutional violations with respect to public employment. Congressional findings had focused on discrimination in the private sector, and Title I's broad remedial scheme was insufficiently targeted to remedy unconstitutional discrimination in public employment. *See id.* at 368-374. Thus, the Court in *Garrett* held that the Eleventh Amendment bars suits seeking money damages for state violations of Title I of the ADA. The Court explicitly left open the question of whether similar suits could be brought for money damages under Title II of the ADA.[29]

---

[29]The Court has also sustained other challenges to overly broad and disproportional legislation that went beyond the scope of § 5. *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997) (finding that Congress exceeded its § 5 authority in enacting Religious Freedom Restoration Act of 1993); *Florida Prepaid*

54

That question was answered, to some degree, in *Lane*, 541 U.S. 509. *Lane* involved a suit by two paraplegic plaintiffs who claimed that they were denied access to the state courts by reason of their disabilities. In that case, the Court explained that Title II was enacted "against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Id.* at 524. The Court referenced the numerous hearings held by Congress in connection with enacting the ADA, which revealed "that many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities." *Id.* at 527. This evidence led Congress to make an explicit finding that disability-based discrimination persisted in access to public services and public facilities. *Id.* at 529.

The Court then reviewed whether Title II was valid § 5 legislation with respect to the class of cases implicating the accessibility of judicial services.[30] As to that conduct, the Court concluded that Title II was a congruent and proportional response to remedy discrimination against disabled individuals

*Postsecondary Ed. Expense Bd. v. College Savings Bank*, 527 U.S. 627 (1999) (concluding that the Patent Remedy Act implicated Article I concerns, not enforcement of the guarantees of the Fourteenth Amendment).

[30]The Court reviewed the congruence and proportionality of Title II as applied to access to judicial services, not the congruence and proportionality of Title II as a whole. *Lane*, 541 U.S. at 531.

55

in the administration of judicial services. Congress chose a limited remedy to enforce Title II with respect to access to the courts. States are required to take "reasonable measures" to remove architectural and other barriers to accessibility, and, in the case of older facilities in which structural changes would be more difficult, states are able to adopt a variety of less costly measures to ensure access to judicial services. *Id.* at 532. As a result, the Court concluded that Title II's affirmative obligation to accommodate persons with disabilities in the administration of justice was a reasonable prophylactic measure targeted to a legitimate end.

*Lane*, however, revealed disagreement amongst members of the Court as to whether Title II may subject States to money damages for conduct that may in fact be constitutional. While the majority opinion recognizes that Congress's prophylactic powers under § 5 may proscribe some conduct that is facially constitutional to "prevent and deter unconstitutional conduct," *Lane*, 541 U.S. at 529, the dissenting Justices forcefully argued that Congress's § 5 powers extend only to remedy actual constitutional violations. *See id.* at 547 (Rehnquist, C.J., dissenting), 559 (Scalia, J., dissenting) ("Nothing in § 5 allows Congress to go *beyond* the provisions of the Fourteenth Amendment to proscribe, prevent, or "remedy," conduct that does not *itself* violate any provision of the Fourteenth Amendment.") (emphasis in original). *But see Constantine v. The Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 490 (4th Cir. 2005) ("[T]he question is not *whether* Title II exceeds the boundaries of the Fourteenth Amendment, but *by how much*.") (emphasis in original).

56

This dispute was held in abeyance in the Court's decision in *United States v. Georgia*, 126 S. Ct. 877 (2006). In *Georgia*, a disabled inmate in a state prison brought a pro se action under Title II of the ADA seeking money damages. The inmate alleged that he was confined within a small cell 23 to 24 hours per day, that he was unable to turn his wheelchair around in his cell, and that he was not afforded adequate facilities to use the toilet and shower without assistance, which often was denied. In addition, he claimed that he was denied a number of essential prison services as a result of his disability. *Id.* at 879. The Court examined whether Title II of the ADA validly abrogated state sovereign immunity with respect to the inmate's claims. It noted that the same conduct allegedly established the inmate's claims under both the Eighth Amendment and Title II. In this respect, the Court agreed that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 882 (emphasis in original). Because it was unclear as to what extent the conduct underlying the inmate's constitutional claims also violated Title II, the Court ordered the case remanded back to the District Court for the inmate to amend his complaint. *Id.* at 882. The Court directed the lower court to (1) identify which aspects of the State's alleged conduct violated Title II; (2) identify to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, determine whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *Id.*

Thus, we are required to determine in the first instance if any aspect of the University's alleged conduct forms the basis for a Title II claim.[31] In this case, the University allegedly violated Title II when it refused to offer Bowers a scholarship on the basis that he would not meet NCAA initial eligibility standards. Title II prohibits a "qualified individual with a disability" from being "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" because of the individual's disability. 42 U.S.C. § 12132. Bowers argues that the University of Iowa discriminated against him because of his learning disability: but for the fact that his learning disability precluded him from taking the requisite number of core classes in high school, he would have been given a scholarship by the University. Bowers thus essentially states a claim under Title II that he was denied access to a program at a public education institution because of his disability.[32]

---

[31]In *Georgia*, the Court remanded to the District Court for this determination. 126 S. Ct. at 882. However, given the procedural posture of this case, we find we are well situated to make this determination ourselves. *See Toledo v. Sanchez*, 454 F.3d 24, 32 n.2 (1st Cir. 2006) ("[A]s this analysis simply requires a legal determination under the standard set out in Fed. R. Civ. P. 12(b)(6), and because a remand would further prolong the lengthy course of this litigation, we will address these questions.").

[32]To succeed on a claim under Title II, Bowers must demonstrate: (1) he is a qualified individual; (2) with a

Under *Georgia*, we are required next to determine whether the alleged misconduct in this case, denying a student athlete eligibility to participate in intercollegiate athletics, also violates the Fourteenth Amendment. Clearly, since the Supreme Court has held that there is no fundamental right to public education, *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973), there is no fundamental right to participate in intercollegiate athletics, a component of public education. Likewise, the Supreme Court has held that the disabled are not a suspect class for purposes of an equal protection challenge. *City of Cleburne v. City of Cleburne Living Center*, 473 U.S. 432, 439 (1985).[33] Accordingly, we apply rational basis review to the Defendants' application of the NCAA rule to Bowers. The NCAA rule (and the universities' adoption and application of the NCAA rule) easily passes muster under rational basis review as the rule is designed to ensure that incoming student athletes can handle the rigors of college academia while engaging in intercollegiate athletics. *See Bowers I*, 974 F. Supp. at 461 (noting the NCAA's view that the requirements "are

_____

disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability. *Bowers III*, 118 F. Supp. 2d at 510.

[33]In the context of public education, the due process clause may be implicated if a student is suspended or expelled without notice or an opportunity to be heard. *See Goss v. Lopez*, 419 U.S. 565, 574 (1975). In this case, however, Bowers' claims do not raise any procedural due process concerns.

59

designed to assure proper emphasis on educational objectives, to promote competitive equity among institutions and to prevent exploitation of student athletes"). The NCAA rule – requiring student athletes to participate in certain basic core classes in high school – is rationally related to the end it attempts to achieve – ensuring that incoming student athletes are prepared to balance academics and athletics. The rule does not target disabled individuals per se, but rather also targets those student athletes who have failed to satisfy their core course requirements for other reasons, including sheer lack of effort. Consequently, the rule does not create a caste system in which learning disabled students can never qualify as student athletes. *See City of Cleburne*, 473 U.S. at 450 (finding that zoning legislation failed rational basis review because it demonstrated irrational prejudice directed solely against the mentally retarded). Thus, the NCAA rule and the university Defendants' application of that rule do not violate the Fourteenth Amendment. *See also Toledo*, 454 F.3d at 33-34 (finding that a university's actions in failing to accommodate disabled student by allowing him, inter alia, to arrive late to class and to extend deadlines for work, did not establish constitutional violations).

Having determined that the alleged misconduct in this case states a claim for violation of Title II but not the Fourteenth Amendment, we arrive at the final step of *Georgia*'s tripartite test. This step requires to determine whether Congress's purported abrogation of state sovereign immunity is nevertheless valid.[34] The right at issue in this case, as in *Lane*, is the right to

---

[34]As already stated, in making this determination we seek to identify: (1) with some precision the constitutional right at

be free from irrational disability discrimination. *Lane*, 541 U.S. at 522. The Court in *Lane* concluded that Congress had clearly identified a history and pattern of disability discrimination with respect to public services. *Id.* at 526.[35] Therefore there is only

issue; (2) whether Congress identified a history and pattern of unconstitutional discrimination by the States against the disabled with respect to public services; and (3) whether the rights and remedies created by the statute are congruent and proportional to the constitutional rights it purports to enforce and the record of constitutional violations adduced by Congress. *Garrett*, 531 U.S. at 365, 368, 372-73.

[35]The Court considered evidence of disability discrimination in a variety of public services, not just limited to access to the courts. *See Lane*, 541 U.S. at 523-26 (referencing voting, serving as jurors, unjustified commitment, abuse and neglect of young persons committed to state mental hospitals, and irrational discrimination in zoning decisions). The Court concluded that there was a documented "pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, *public education*, and voting." *Id.* at 525 (emphasis added). Subsequent decisions of the courts of appeals have recognized that the second prong of the *Boerne* test was conclusively established with respect to Title II by the *Lane* Court. *See Cochran v. Pinchak*, 401 F.3d 184, 191 (3d Cir. 2005); *see also Constantine v. The Rectors and Visitors of George Mason University*, 411 F.3d 474, 487 (4th Cir. 2005) ("After Lane it is settled that Title II was enacted in response to a pattern of unconstitutional disability discrimination by States and nonstate

61

government entities with respect to the provision of public services."); *Assoc. for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005). *But see Toledo*, 454 F.3d at 35 ("We believe the sounder approach is to focus the entire *City of Boerne* test on the particular conduct of state conduct at issue.").

Disability discrimination has clearly been identified in the context of public education. As the Government documents extensively in its brief, there had been a long and sad history of discrimination against students with learning disabilities prior to the adoption of Title II of the ADA. (See Gov'ts Br. at 23-34.) *See also Lane*, 541 U.S. at 525 n.12 (citing examples of state-sanctioned public school discrimination); *State ex rel. Beattie v. Bd. of Educ. of City of Antigo*, 172 N.W. 153 (Wis. 1919) (justifying the exclusion of a child with cerebral palsy from public school because he would "produc[e] a depressing and nauseating effect" on other children). In concluding that Congress was justified in enacting Title II with respect to public education, the First Circuit stated the following:

> In sum, the thirty years preceding the enactment of the ADA evidence a widespread pattern of states unconstitutionally excluding disabled children from public education and irrationally discriminating against disabled students within schools. Faced with this record of persistent unconstitutional state action, coupled with the inability of earlier federal legislation to solve this "difficult and intractable problem," Congress was justified in enacting prophylactic § 5 legislation in response.

one difficult issue left at this point in the inquiry: the congruence and proportionality of Title II with respect to public education.

We agree with the United States that "[a]s applied to education, Title II is a congruent and proportional means of preventing and remedying the unconstitutional discrimination that Congress found to exist both in education and in other areas of governmental services, many of which implicate fundamental rights." Br. for the United States at 36-37. The remedy chosen by Congress in Title II in the area of public education is a narrow one: access to education. Qualified individuals with a disability may not be excluded from participating in public education on the basis of their disability. Thus, states are free to enact a myriad of laws relating to public education, including laws that may negatively impact disabled students, so long as those laws do not discriminate against students *because of* their disabilities. Congress enacted Title II against the backdrop of our regrettable national history in educating students with disabilities. *See* infra note 35. As pointed out correctly by the United States in its brief, our national history in educating students with disabilities leaves much to be desired. In many past instances, States have made educational decisions on the basis of irrational misconceptions and stereotypes held about disabled students. *See* Gov'ts Br. at 27-32 (documenting various instances of exclusion and segregation of disabled students). Given this regrettable past history, Title II is a justifiable prophylactic measure to avoid the risk of unconstitutional treatment of disabled students.

---

*Toledo*, 454 F.3d at 39 (citing *Hibbs*, 538 U.S. at 735).

Reported cases from the courts of appeals since the Supreme Court's decision in *Georgia* have likewise found that Congressional abrogation of sovereign immunity with respect to public education was valid. As the Fourth Circuit observed in *Constantine*, Congress limited the scope of Title II in several respects. First, the statute only protects "qualified individuals with a disability." Second, Title II permits States to limit participation in their programs and activities for all other lawful reasons. Third, Title II only requires States to make "reasonable modifications" to accommodate the disabled, thus protecting the States from having to compromise essential eligibility criteria for public programs. Finally, States are able to make available other accommodations if structural modifications of physical structures are too burdensome. 411 F.3d at 488-89. For those reasons, and against the backdrop of discrimination against disabled students, the *Constantine* court concluded that Title II was valid legislation as applied to public education. *Id.* at 490. *See also Toledo*, 454 F.3d at 40 ("Title II's prophylactic measures are justified by the persistent pattern of exclusion and irrational treatment of disabled students in public education, coupled with the gravity of the harm worked by such discrimination."); *Assoc. for Disabled Americans, Inc.*, 405 F.3d at 959 ("Discrimination against disabled students in education affects disabled persons' future ability to exercise and participate in the most basic rights and responsibilities of citizenship, such as voting and participation in public programs and services. The relief available under Title II of the ADA is congruent and proportional to the injury and the means adopted to remedy the injury.").

Accordingly, we join several sister circuits in holding that Congress acted within its Constitutional authority in abrogating sovereign immunity under Title II of the ADA.

## III.  CONCLUSION

We agree with the District Court that this case has become an ongoing saga.  With this opinion, we have contributed yet another episode to the saga, but it has not been our intention to thicken the plot.  With that in mind, we observe that a central question has yet to be resolved:  whether the Defendants, in their treatment of Michael Bowers, in fact violated anti-discrimination law.  Consequently, we will reverse the order of summary judgment and remand this matter to the District Court for treatment in accordance with the rulings stated herein.