

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-17-2007

# Torres v. Amerada Hess Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-2263

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Torres v. Amerada Hess Corp" (2007). *2007 Decisions.* Paper 755.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/755

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-2263
_____

KAREN TORRES,

Appellant,

v.

AMERADA HESS CORPORATION

_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 04-cv-01249)
District Judge: Hon. Joel A. Pisano

Submitted Under Third Circuit LAR 34.1(a)
May 22, 2007

Before: BARRY, CHAGARES, and TASHIMA,[1] <u>Circuit Judges</u>.

_____

(Filed July 17, 2007 )

OPINION OF THE COURT

_____

[1]The Honorable A. Wallace Tashima, United States Circuit Judge for the Ninth
Circuit Court of Appeals, sitting by designation.

CHAGARES, Circuit Judge.

Following the repeated failures of plaintiff/appellant Karen Torres and her counsel to fulfill discovery obligations, defendant/appellee Amerada Hess Corporation ("Hess") moved, pursuant to Federal Rule of Civil Procedure 37(b), for dismissal with prejudice of Torres' lawsuit against Hess. The District Court granted that motion. On appeal, Torres argues that the District Court erred by granting Hess' Rule 37 motion, and that the District Court engaged in improper ex parte contact with Hess' counsel. Because we find that neither claim has merit, we will affirm.

I.

On March 16, 2004, Torres filed a lawsuit against Hess alleging harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964. At that time, Torres was proceeding pro se. Following Hess' answer, the Magistrate Judge handling the case entered a scheduling order which provided, inter alia, that interrogatories and requests for production should be served on or before November 12, 2004, and that all discovery should be completed by January 31, 2005. The scheduling order admonished that "[t]he dates set forth in this Scheduling Order are to be adhered to strictly. The imposition of sanctions, including dismissal or default, will be entertained for non-compliance." 13SA.[2] Hess served a notice to take Torres' deposition, interrogatories, and requests for production of documents on November 11, 2004. Pursuant to the terms of the scheduling

_____

[2]"SA" refers to documents in the Supplemental Appendix; "A" refers to documents in the Appendix.

2

order, Torres' responses to Hess' requests for discovery were due no later than December 12, 2004. Torres failed to respond. By letter dated December 17, 2004, Hess notified Torres that her discovery responses were delinquent, and that if Torres did not respond within seven days, Hess would file a motion with the Court seeking appropriate relief. Torres again failed to respond. Thereafter, Hess filed a letter with the Court seeking permission to file a motion to dismiss pursuant to Rule 37 in view of Torres' failure to comply with her discovery obligations. Rather than permit the motion, the Magistrate Judge scheduled a conference for January 24, 2005 to discuss the parties' discovery difficulties.

In the interim, on January 11, 2005, Torres advised Hess that she would not appear for her deposition, and that she had retained counsel. At the January 24, 2005 hearing, Torres appeared with her counsel, Sandra Frelix. At the conclusion of the hearing, the Magistrate Judge extended the discovery deadline to March 31, 2005, and also scheduled an in-person status conference for March 9, 2005. A review of the relevant portions of the transcript of the January 24 hearing makes clear that the scheduling leniency stemmed from the Magistrate Judge's belief that Frelix was new to the case:

> THE COURT: We're here today initially as a result of discovery problems . . . brought to my attention with respect to Ms. Torres, who, at that point, was representing herself pro se.
>
> I got a letter dated [January 20, 2005] . . . explaining that apparently there's a new lawyer in this case, which I assume is Miss . . .
>
> ATTORNEY FRELIX: Frelix.

3

347SA.

As the Magistrate Judge would later learn, however, Frelix was not nearly as new to the case as she led the Court to believe. By her own admission, Frelix had been retained by Torres to represent her in this case "[i]n the fall of 2004." 286SA.

In any event, during the January 24, 2005 conference, Frelix requested leave to amend Torres' pro se complaint, stating that she wanted to file "just an extension of what [Torres] already submitted, it's just more detailed. . . . The -- her claims are the same, but it's just giving more detail . . . ." 351SA. The District Court granted this motion, and noted that any motion to amend the pleadings must be filed by February 11, 2005. 276SA. Frelix missed this deadline by almost a month. When she finally did file an amended complaint on March 10, 2005, the original five paragraph complaint grew to twenty-five pages and 137 paragraphs. 234A-259A (amended complaint). Furthermore, and contrary to Frelix's earlier representations, the amended complaint did not merely flesh out the claims in Torres' original complaint, but instead added eight new claims under various state and federal anti-discrimination laws.

Frelix failed to appear at the March 9 status conference.[3] Accordingly, on March 16, 2005, the Magistrate Judge issued an order to show cause why Frelix should not be sanctioned for her failure to appear at the status conference.

_____

[3]At a March 30, 2005 conference, Frelix informed the Magistrate Judge that she did not appear at the March 9 conference because of a flood in her home. 314SA.

4

By letter dated March 9, 2005, Hess advised the Magistrate Judge that Torres'
discovery responses were woefully deficient. Among the problems Hess noted were
Torres' (i) failure to produce documents responsive to Hess' Rule 34 requests; (ii) failure
to grant Hess access to medical records pertinent to Torres' discrimination claims; and
(iii) failure to respond to numerous interrogatories. 334SA-338SA. At a hearing on
March 30, 2005 -- the day before discovery was to close -- the Magistrate Judge
expressed her concerns about Frelix's lack of candor and failure to meet her professional
obligations, stating:

> You made a representation to me, Counsel, that you just wanted to clean up
> the pro se complaint, a complaint that she drafted at the time you were
> allegedly representing her. . . . The amended complaint was not filed . . .
> because you added all new causes of action, which was a very different
> representation that was meant -- that then was made to me back in January.
>
> Second of all, you made no efforts to get that amended complaint to [Hess'
> counsel] or to me in a timely manner that we could have the discussion.

295SA-96SA.

In addition to these transgressions, the Court further observed that some of the
causes of action Frelix added were "frivolous and sanctionable" for various reasons,
noting that Torres had not exhausted her administrative remedies with respect to the
disability discrimination claim added in the amended complaint, and that a state law
discrimination claim was precluded because Torres was at that time pursuing it before the
New Jersey Civil Rights Board. 300SA.

5

In closing, the Magistrate Judge observed that Torres' counsel had failed to comply with deadlines to which she agreed, and had not offered any explanation for her non-compliance, stating:

> There comes a point in litigation where if orders aren't followed, they have no meaning, and that's where we're at in this case. There has been . . . complete disregard by [Frelix] of answering interrogatories, producing documents, showing up in court, following the rules for amended complaints, [and] no different conclusion with the way expert discovery has been handled.

312SA.

Rebuffing Torres' request for yet another extension to produce expert reports on which Torres intended to rely, the Magistrate Judge ruled:

> [D]espite [Hess'] counsel's invitation . . . to try to work out issues and reminding [Frelix] of the deadline, [and notwithstanding] the Court asking either side to raise with me any discovery issues in writing, I received nothing.
>
> The problem with extending discovery [] deadline[s] means that by extending the deadline for plaintiff. . . it's a month past the deadline, and I'm not even hearing that she has the reports in ha[n]d, but she needs additional time to get the reports, which means I'd have to give her additional time, then I'd have to give defense counsel additional time, and that will unfairly and unduly delay this case. I've heard no reason . . . for the delay, none has been proffered by plaintiff's counsel. And what makes it even more serious, in my mind, is that I gave [Frelix] -- before setting that deadline at oral argument, I asked her if that would be acceptable, and she said, yes. Since that time there has been no attempt to comply with my deadline.

312SA-13SA. Accordingly, the Magistrate Judge barred Torres from relying on any expert testimony at trial.

By Order dated March 30, 2005, the Magistrate Judge ordered Torres to produce

the following documents on or before April 8, 2005:

(i) All documents responsive to Hess' requests for production;
(ii) Full and complete interrogatory answers;
(iii) All of Torres' earnings records since January 1, 2001;
(iv) All documents pertaining to Torres' damages or injuries;
(v) Signed authorizations releasing Torres' medical, psychological, and healthcare providers; and
(vi) A Rule 26 identification of witnesses and computation of damages.

357SA-59SA.

Immediately following the March 30 hearing, Hess began to take Torres'

deposition. During this deposition, Torres stated that she had given a voluminous

amount of documents to Frelix, the vast majority of which Frelix had failed to

produce. The relevant portion of Torres' deposition reads as follows:

QUESTION: Did you participate in the preparation of the amended complaint?

TORRES: Yes.

QUESTION: What did you do?

TORRES: I had to give [Frelix] like (sic) documents. I guess names. Yeah.

QUESTION: And where did you get those documents from?

TORRES: From my home.

QUESTION: And where in your home do you keep those documents?

TORRES: I keep them -- actually I have them on the floor in my bedroom. I have files.

7

QUESTION: How many files?

TORRES: Whew. I don't know exactly how many files I have. I have quite a bit.

QUESTION: You have quite a number of files?

TORRES: Correct.

QUESTION: And they all relate to your employment at Amerada Hess?

TORRES: Yes.

QUESTION: And they all have relevance to this lawsuit?

TORRES: Yes.

QUESTION: If you stacked them all up from bottom to top, about how high would those files be? Show me with your hand if you'd like.

TORRES: Maybe about here (indicating).[4]

***

QUESTION: And you didn't produce all of them. You only produced some of them, right?

TORRES: Correct.

39SA-41SA.

At her deposition, Torres revealed for the first time that she had tape recordings pertinent to her pending lawsuit. The pertinent part of the deposition transcript reads as follows:

_____

[4]An image taken from the video of Torres' deposition makes clear that Torres indicated that she had a stack of documents approximately one foot high. 360SA.

QUESTION: Among the materials that you have relating to this case, do you have any tape recordings?

TORRES: Yes, I do.

QUESTION: Did you produce any tape recordings in response to any requests made of you in this case?

TORRES: No, I did not.

\*\*\*

QUESTION: What are the tape recordings of?

TORRES: One is Ms. Gibson [Torres' former supervisor at Hess]. Actually Ms. Gibson, Work & Well who's [Hess'] benefit administrator, and Mr. Walter Vertreace [Hess' EEO Director], [and] Mr. Charles Iszard [Hess' Merchandising Manager.]

\*\*\*

QUESTION: How many tape recordings do you have?

TORRES: I believe -- I believe five, yeah.

41SA-43SA. Torres further stated that she no longer had possession of these tapes, but had recently given them to her father, and invited Hess to subpoena her father to obtain the tapes if Hess would like them produced. 48SA.

By letter dated April 1, 2005, Torres' counsel informed the Magistrate Judge that she "was unable to make [the discovery] deadline" established at the March 30, 2005 hearing. In her defense, Torres' counsel noted that "[t]here were almost one thousand (1,000) documents that required organizing and copying. The documents were placed into a box and delivered to the defendants." 361SA.

9

At an April 27, 2005 status conference, Hess' counsel informed the Magistrate Judge that, contrary to Frelix's representations to the Court that she had produced roughly 1,000 documents, Frelix had produced fewer than 90 documents comprising less than 150 pages in total. 9SA-10SA. Hess further noted that many of the documents Frelix produced were in fact copies of other documents she produced, so that the actual number of documents produced was even less than would otherwise appear. Id. Finally, Hess represented that Torres had yet to produce the five tapes she referenced at her deposition, despite the fact Hess had repeatedly asked her to do so.

The Magistrate Judge again observed that Frelix had failed to meet her discovery obligations in direct contravention of numerous Court orders, stating:

> Ms. Frelix -- I'm really losing -- this is really bordering on sanctionable attorney misconduct, it is, because I gave you an opportunity to be heard on March 30th. I told you to turn over everything. You stood up before and said, I will get everything to them. . . .

***

> It's not right that [that after Hess has] taken a deposition for two days, after we had a hearing, and there's still an issue of whether [Torres] turned over documents. So I'm entering an order today barring the use of documents that have not been turned over in discovery to date.

***

> I'm going to enter . . . a preclusion order. I'm also going to order Ms. Frelix, as an officer of the court, to meet with her client and make a good faith inquiry to search for any relevant documents, and if any come out -- and tapes. And if any of them -- regardless of my preclusion order -- and if any of those -- they should be immediately turned over to defense counsel.

365SA-68SA.  That same day, the Magistrate Judge issued an Order stating in pertinent part that:

> Plaintiff's counsel is directed to meet and confer with her client, Karen Torres, in order to make a good faith inquiry in determining the existence and location of any and all documents and any other tangible things which are responsive to Defendant's First Request for Production of Documents in this matter, including, without limitation, certain audio tapes Plaintiff claims are currently in the possession of her father, and shall produce all such documents and tangible things to Defendant's counsel at their Newark, New Jersey office no later than May 3, 2005.

372SA.

Torres failed to comply yet again, producing nothing by the May 3, 2005 deadline, notwithstanding the Magistrate Judge's Order and Frelix's earlier representation to the Magistrate Judge that she would "produce that tape."  364SA.  Nonetheless, by letter dated May 8, 2005, Frelix represented to Hess' counsel that she had produced all documents responsive to Hess' first request for production, an assertion Frelix reiterated in a May 11 letter to the Court.  373SA-386SA; 387SA.  In this same letter, however, Frelix also stated:

> I further determined that the balance of documents or other tangible things, including, without limitation, audio tapes, doctors' notes, or Plaintiff's own notes or records are barred from production pursuant to your March 30, 2005 Order.

387SA.

Hess resumed its deposition of Torres on May 17, 2005, despite the fact that Torres had still produced no audio tapes.  When asked about the tapes at her deposition,

Torres not only confirmed that she had a copy of the tape[5] in her possession (in addition to the tapes possessed by her father), but that she had had the tape since prior to the April 27 status conference. See 86SA-89SA. Torres further admitted in her deposition her belief that she had erased numerous tape recordings she had created, possibly including several involving her immediate supervisor, whom Torres had identified as one of her harrassers. 129SA.

Hess continued its deposition of Torres on May 24, 2005. At that time, Torres produced a single audio tape that Torres had created and edited down to a single recorded conversation. When Hess' counsel inquired why the entire tape, including all recorded conversations, had not been produced in accordance with the April 27 Order, Torres responded that she had not done so (i) because Hess' request for production was overly broad to the point of being "harassing"; and (ii) because Torres' father "was entirely against" production of the tapes. 193SA-196SA.

Hess' attempts to elicit information from Torres about her claims were equally fruitless. The following is a representative exchange from her deposition:

QUESTION: Who retaliated or discriminated against you because you were female?

TORRES: Well -- well, I look at it as I'm not a black male. I'm a black female, so to that nature.

---

[5]The deposition transcript alternative refers to "tape" and "tapes" because in her March 30 deposition, Torres testified that she had copied all of the tapes onto a single master tape. 87SA.

QUESTION: Who discriminated against you because you are female?

TORRES: Ken Fish.

QUESTION: Why do you say Mr. Fish discriminated against you because you are female?

TORRES: Well, I feel that -- I can't answer that question at this time.

QUESTION: Why is that?

TORRES: Because I -- at this time, I can't recall as to the reason why I had that in the Complaint.

QUESTION: You took it very seriously. You filed a Complaint in the United States District Court, and you can't remember why you alleged that you were discriminated against because you are female? Is that your testimony?

TORRES: Yes, sir. There's a lot of things I can't remember, unfortunately.

197SA-98SA.

At other points in her deposition, Torres simply refused to respond to Hess'

counsel's questions. The following colloquy is illustrative of Torres' reticence:

QUESTION: So what is it that you received from the Department of Insurance?

TORRES: I'm sorry, sir. I can't answer that question, and I'll give you my reasons why. Because I have a second pending complaint against Amerada Hess, I cannot answer that question so --

QUESTION: You have a second pending complaint?

TORRES: That's correct, sir.

QUESTION: And where is that complaint?

TORRES: I do not wish to answer that question, sir. It has nothing to do with this case, with all due respect to you.

QUESTION: Are you refusing to answer the question?

TORRES: I am refusing to answer that question. That is correct.

QUESTION: I'm going to ask you a series of questions about your other complaint against Amerada Hess.

TORRES: Sir, I plead the fifth with all of them.

QUESTION: Do you understand what it means to plead the fifth?

TORRES: Yes, I do. I do not want to be incriminated against any pending case outside this case. From what I understand -- I don't have any legal expertise; but, again, I cannot answer any question regarding to [sic] a pending case against Amerada Hess. It is not referring to this case. It is an outside case. I do not have to answer that.

QUESTION: Is the other case that you have against Amerada Hess a case which you filed in a court?

TORRES: (No audible response.)

QUESTION: Are you now refusing to speak?

TORRES: I have already answered your question, sir.

QUESTION: Is the other case that you have against Amerada Hess in an administrative agency?

TORRES: That is correct.

QUESTION: Which agency?

TORRES: Again, I refuse to answer that question. It has nothing to do with this Complaint, sir.

*** 

14

QUESTION: Would you describe the general subject matter of the other action which you have against Amerada Hess?

TORRES: I have already answered that, sir.

QUESTION: Okay; and when you say you've already answered it, you mean you have answered that you're refusing to provide that information; is that right?

TORRES: I think I mentioned to you that I refuse to answer any question that has to do with a second complaint against Amerada Hess.

71SA-73SA.

At a hearing on June 7, 2005, Hess' counsel informed the Magistrate Judge that Torres had still not produced numerous documents and things responsive to Hess' discovery requests. In response, the Court again warned Torres and Frelix that if they failed to comply with discovery orders, the Court would entertain a motion for sanctions, up to and including a dismissal of Torres' lawsuit.

Thereafter, on June 28, 2005, Hess moved to dismiss Torres' lawsuit with prejudice pursuant to Rule 37. Torres filed an untimely response in late July, which prompted Hess' counsel to contact the Magistrate Judge's chambers to inquire whether a response would be necessary or appropriate. Chambers staff informed Hess' counsel that, given the untimeliness of Torres' response, no response would be necessary. At oral argument on Hess' Rule 37 motion, the Magistrate Judge inquired about the status of Torres' response to Hess' interrogatories, which by that time was some five months overdue:

15

THE COURT: Let's talk about the interrogatories. How many times does [Hess' counsel] have to tell you that he wants certified answers? It's so clear in the rules. It's in my orders. He's asked 100 times. He's never gotten certified answers. What's the story with that? Do you want to answer?

ATTORNEY FRELIX: Your Honor, I -- Your Honor, I don't have anything to say.

404SA.

In a Report and Recommendation ("R&R") dated February 27, 2006, the Magistrate Judge granted Hess' motion for a dismissal with prejudice, which the District Court adopted by Order dated March 14, 2006. Torres now appeals.

II.

A.

We review for abuse of discretion the District Court's decision to dismiss the complaint as a sanction for failure to comply with discovery obligations. Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 538 (3d Cir. 2007). "Although we have held that dismissal is a harsh remedy and should be resorted to only in extreme cases," we have similarly recognized that "[d]istrict court judges, confronted with litigants who flagrantly violate or ignore court orders, often have no appropriate or efficacious recourse other than dismissal of the complaint with prejudice." Mindek v. Rigatti, 964 F.2d 1369, 1373 (3d Cir. 1992) (internal quotations omitted). To evaluate the District Court's exercise of its discretion, we apply the familiar six-factor balancing test established in Poulis v. State Farm Fire and Casualty Co., 747 F.2d 863 (3d Cir. 1984). Under Poulis, a court must

16

consider: (i) the extent of the party's personal responsibility; (ii) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (iii) a history of dilatoriness; (iv) whether the conduct of the party or the attorney was willful or in bad faith; (v) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (vi) the meritoriousness of the claim or defense. Id. at 868. As we have previously observed, the balancing of these factors is not a mechanical exercise; "not all of the Poulis factors need be satisfied in order to dismiss a complaint." Mindek, 964 F.2d at 1373. On appeal, we afford the District Court's decision "great deference" in view of the fact that, unlike us, the District Court -- or here, the Magistrate Judge -- has had direct contact with the litigants and is intimately familiar with the disruptions and difficulties caused by the behavior that led to the punitive dismissal. Id.

In this case, the Poulis factors overwhelmingly militate in favor of dismissal. With respect to the extent of Torres' personal responsibility, the Magistrate Judge concluded that:

> Torres is personally responsible for the multitude of discovery failures, including concealment of audio recordings -- both when she was pro se and after she was represented by counsel. Her conduct at depositions speaks volumes as to her personal responsibility. She purposefully withheld documents and gave tapes to a third party -- despite being ordered to turn them over by this Court. That conduct demonstrates a willful act to conceal discovery. . . .

17

R&R at 11. We have no difficulty concluding that this longstanding pattern of evasiveness constituted intentional, willful defiance of the Magistrate Judge's numerous orders, many of which explicitly warned Torres that a failure to comply could lead to the dismissal of her lawsuit.

Second, it is beyond dispute that Hess has suffered prejudice as a result of Torres' failure to comply with her discovery obligations, as Hess has been repeatedly rebuffed in its attempts to learn about the substance and nature of Torres' claims. As the Magistrate Judge observed:

> The claims are a moving target. Select documents are produced; others are held back. "Binders" of documents are missing; audio tapes are given away to third-parties. Questions are not answered at deposition. Interrogatory answers are not certified. Health care providers are not identified. Despite numerous letters to counsel and the Court, protracted hearings, numerous Orders to Compel, and a Preclusion Order, Torres has failed to produce basic, obvious and core information.

R&R at 12. We would add that Torres' infractions were not limited to non-compliance. To the contrary, by her own admission, Torres took affirmative steps to destroy or alter documents and audio tapes that were the subject of numerous and longstanding discovery requests. Of course, the precise probative value of these items can never be known, but one may infer that had they been produced in unaltered form, they would not have redounded to Torres' benefit. Accordingly, we find that Torres' flagrant non-compliance substantially impaired Hess' ability to prepare a defense.

18

Third, with respect to Torres' history of dilatoriness, no extended discussion is necessary -- the facts set forth previously speak for themselves. For her part, Torres seeks to disavow any personal responsibility for her discovery defaults, pointing to her history of mental health problems. Even accepting as true that Torres does suffer from mental illness of some sort, she has adduced no evidence that would explain (let alone excuse) how her repeated failures to answer questions under oath or to comply with discovery orders somehow resulted from any medical condition. Accordingly, we find that this factor also counsels in favor of dismissal.

Fourth, with respect to whether Torres acted willfully or in bad faith, we again note that the record makes clear that Torres and Frelix willfully disregarded the discovery orders entered by the Magistrate Judge. This misconduct was not limited to an isolated incident. The record is littered with any number of examples in which Torres and/or Frelix said they would produce one thing or another, and then promptly did the opposite. Perhaps the most galling example of this is Frelix's May 11, 2005 letter to the Court in which she stated that:

> I further determined that the balance of documents or other tangible things, including, without limitation, audio tapes, doctors' notes, or Plaintiff's own notes or records are barred from production pursuant to your March 30, 2005 Order.

387SA. It is flatly inexplicable how Frelix could read the March 30, 2005 Order (or, for that matter, subsequent discovery orders) to bar the production of ***anything***, let alone the audio tapes that the Magistrate Judge had specifically and explicitly ordered Torres and

Frelix to produce. See 365SA-69SA. (The Court: "I'm going to enter . . . a preclusion order. I'm also going to order Ms. Frelix, as an officer of the court, to meet with her client and make a good faith inquiry to search for any relevant documents, and if any come out -- and tapes. And if any of them -- regardless of my preclusion order -- and if any of those -- they should be immediately turned over to defense counsel."). Frelix's letter is even more inexplicable in view of the fact that Frelix had explicitly agreed -- post-March 30, no less -- to "produce that tape." 364SA. We therefore cannot help but conclude that this sort of evasiveness was willful and in bad faith.

Fifth, with respect to the effectiveness of lesser sanctions, a review of the procedural history of this case makes clear that the Magistrate Judge demonstrated an abundance of patience with Torres' discovery defaults. To begin with, the Magistrate Judge repeatedly warned Torres and Frelix that a failure to comply with discovery obligations could lead to the dismissal of Torres' lawsuit, warnings which went unheeded. Moreover, the Magistrate Judge eschewed a punitive dismissal in favor of a lesser sanction on at least two prior occasions, issuing preclusion orders in lieu of granting the dismissal Hess had sought. Viewing Torres' and Frelix's conduct as a whole, there can be no doubt that the District Court dismissed Torres' lawsuit as a last resort only after less onerous sanctions proved futile.

The sixth and final factor is the meritoriousness of Torres' claims. On this score, the record is largely devoid of any evidence (as contrasted with bald, conclusory

20

allegations) of discrimination. Torres simply claims not to be able to recall the overwhelming majority of the discriminatory acts she suffered because of the virulence of Hess' conduct and that of its employees. Torres' professed ignorance is odd, because one would think that the worse someone is treated, the more likely she would be to remember such mistreatment. At any rate, even taking this putative loss of memory at face value, it does not come remotely close to convincing us that the District Court somehow abused its discretion in view of the fact that the other five <u>Poulis</u> factors strongly counsel in favor of dismissal.

B.

Torres' claim that Hess' counsel engaged in improper <u>ex parte</u> contact with the Magistrate Judge is frivolous. The undisputed record shows that Hess' counsel contacted the Magistrate Judge's chambers for the sole purpose of determining whether Hess would be permitted or required to respond to Torres' untimely response to Hess' June 2005 Rule 37 motion. To begin with, this communication was only necessary because Torres failed to file a timely response to Hess' dismissal motion. It is more than a little disingenuous for Torres to complain about improper <u>ex parte</u> contact when such communication was necessitated by Torres' failure to adhere to clearly established filing deadlines. Moreover, it is clear from the record that the communication in issue was purely procedural, and substantive advice was neither solicited nor offered. <u>See</u> <u>In re Sch.</u> <u>Asbestos Litig.</u>, 977 F.2d 764, 789 (3d Cir. 1992) (stating that <u>ex parte</u> contacts are

21

"tolerated of necessity . . . where related to non-merits issues [and] for administrative matters . . . ").  For these reasons, we find unpersuasive Torres' allegations of improper ex parte contact.

## III.

For the foregoing reasons, we will affirm the decision of the District Court in all respects.