**Terryn RISK,**

v.

**BURGETTSTOWN BOROUGH, PENNSYLVANIA,**
**Appellant.**

**No. 08–4746.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit L.A.R. 34.1(a) Nov. 10, 2009.

Opinion Filed: Feb. 12, 2010.

Samuel J. Cordes, Esq., Tiffany R. Waskowicz, Esq., Ogg, Cordes, Murphy & Ignelzi, Pittsburgh, PA, for Terryn Risk.

Paul D. Krepps, Esq., Patricia A. Monahan, Esq., Stephen J. Poljak, Esq., Teresa

O. Sirianni, Esq., Danielle M. Vugrinovich, Esq., Marshall, Dennehey, Warner, Coleman & Goggin, Pittsburgh, PA, for Appellant.

Before: AMBRO, GARTH and ROTH, Circuit Judges.

## OPINION

GARTH, Circuit Judge:

Appellant Burgettstown Borough, Pennsylvania ("Borough") appeals from the District Court's denial of its motion for judgment as a matter of law or for a new trial. We will affirm.

### I.

#### A.

Appellee Terryn Risk was employed by Borough as a police officer from October 2002 through March 5, 2005. From 2002 through the summer of 2004, Risk wore a small cross-pin on the lapel of his police uniform while he was on duty as a sign of his strong Christian beliefs. Risk freely discussed his religious convictions with Borough's Chief of Police George Roberts and his other colleagues on the police force.

In the summer of 2004, Chief Roberts told Risk to remove the cross-pin from the lapel of his uniform. Risk complied with this request, but registered his protest to members of the Burgettstown Borough Council, including Council President Pam Church and Council Police Department Liaison Dan Johnson. Church and Johnson both told Risk that they had no problem with his wearing a cross-pin on the lapel of his police uniform. Risk subsequently began wearing the cross-pin again until Chief Roberts again asked him to remove it.

During Risk's tenure with the police force, fellow officer Lieutenant Joseph Murray was overheard by a local store clerk, Amy Prevost, speaking to another officer about Risk's religious beliefs in a derogatory manner. According to Prevost, Murray told the other officer to make sure he carried Tylenol along with him on his upcoming patrol with Risk, because he was likely to get a headache from having to listen to Risk's preaching about "church and God." Prevost subsequently reported this conversation to Chief Roberts and expressed concern regarding the unfavorable characterization of Risk's religious beliefs, but in response Roberts merely laughed.

In fall 2004, members of the Borough Council began discussing the need to reduce the number of officers in its police department for budgetary reasons. At the time, Borough employed one full time police officer—Chief Roberts—and nine part-time officers, one of whom was Risk. A study conducted by the Borough Council concluded that it would be more economical for the town to employ two full-time officers and only three part-time officers.

In November 2004, Chief Roberts was chatting with Prevost, and in the course of the conversation they began discussing the impending cuts to the police force. Roberts asked Prevost her opinion regarding which three of the department's nine part-time officers should be retained, and Prevost responded by naming Risk, Lt. Murray, and a third officer, Sergeant August Modin. Roberts then commented that Risk would not be retained because his church attendance interfered with his obligations to the police force. Prevost responded that she didn't think the Borough should get rid of a good officer just because he went to church.

Prevost subsequently informed Risk of her conversation with Chief Roberts. Risk believed that Roberts' comment about his church attendance interfering with his job, particularly in light of Roberts' repeated requests that Risk remove his cross-pin, was evidence of religious discrimination. Risk sought legal counsel, and on Decem-

ber 7, 2004, Risk's attorney drafted a letter, addressed to Chief Roberts and copying all members of the Borough Council, requesting that Risk be permitted to wear the cross-pin on his uniform, and asserting that firing Risk for the reasons articulated by Roberts in his conversation with Prevost would constitute unlawful religious discrimination. Risk's attorney attached a written statement by Prevost outlining the contents of her conversation with Chief Roberts. None of the letter's recipients ever responded to Risk's concerns.

On January 9, 2005, Borough removed Risk from the police officer's duty schedule. On February 16, 2005, Borough wrote to all police officers announcing that it would be making cuts to the force based upon performance and availability. At that time, Risk informed councilman and police liaison Johnson that he was "very available" to work. Risk also wrote a letter to Chief Roberts stating that he was available to work every day.

On June 23, 2005, Borough officially notified Risk of his termination. In accordance with the recommendation of the cost-study, Borough elected to retain three part-time officers on the force. In addition to retaining Lt. Murray, Borough also retained two other part-time officers: Price and Nichols. Significantly, Borough had hired Nichols in September 2004, nearly two years after it had hired Risk.

When Risk had initially begun working as a Borough police officer in 2002, he had applied for a waiver of the otherwise-mandatory training program, because he had already undergone a similar training program in preparation for his employment as a police officer in Amsterdam, Ohio. At the time that Risk completed his waiver application, he was under the impression that his training and experience in Ohio qualified him to waive out of the Borough's mandatory training program. Risk's waiver application was accepted, and he was certified to work as a Borough police officer without having to attend the training program.

In May 2006, more than a year after Borough had fired Risk, a Borough attorney communicated with the Pennsylvania Municipal Police Officers' Education and Training Commission ("MPOETC") with questions regarding the validity of Risk's certification. This led to an inquiry into whether Risk's prior experience as a police officer in Ohio had been sufficient to permit a waiver of training in Pennsylvania. The investigation concluded on September 13, 2007, when the MPOETC determined that Risk's certification had been issued in error, since his Ohio police work was in fact not sufficient to entitle him to a waiver of training requirement prior to his work for Borough. Notably, Risk was not found to be at fault for the erroneous issuance of certification.

### B.

On August 2, 2005, Risk filed a complaint against Borough asserting four causes of action alleging violations of various constitutional rights, as well as violation of 42 U.S.C. § 1983. Risk later filed an amended complaint, which included Title VII counts of discrimination and retaliation based upon religion. Risk also filed a second amended complaint asserting a cause of action under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 955(a), *et seq.*

In response, Borough filed a motion for summary judgment, which the District Court granted in part and denied in part. The District Court granted summary judgment in favor of Borough with respect to Risk's constitutional claims, but denied the motion with respect to Risk's Title VII and PHRA claims.

The action proceeded to trial, which was held from March 24–27, 2008. At the con-

clusion of the trial, the jury found in favor of Risk, concluding that Risk's religion was a determinative factor in Borough's decision to terminate Risk's employment. The jury entered a verdict in favor of Risk in the amount of $100,000 in compensatory damages.

On May 29, 2008, Borough filed a motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), or for a new trial pursuant to Fed.R.Civ.P. 59. Borough argued that it was entitled to judgment as a matter of law or, alternatively, a new trial, because the District Court had committed reversible error in: (1) prohibiting Borough from using the fact of Risk's decertification to contest his establishment of a prima facie case of Title VII discrimination; (2) admitting certain evidence during the trial; and (3) providing erroneous instructions to the jury.

The District Court entered a memorandum and order on November 14, 2008, 2008 WL 4925641, denying in whole Borough's motion for judgment as a matter of law or for a new trial. Borough timely appealed.[1] Inasmuch as the parties are familiar with all the details of this case and trial, we need not dwell at length on the various arguments asserted by Borough and Risk.

## II.

Borough argues that the District Court erred in prohibiting Borough from using evidence of Risk's *ex post facto* decertification to challenge the viability of Risk's Title VII claim. Borough submits that if it had been permitted to use evidence of the decertification to challenge Risk's Title VII claim, Risk would not have been able to make out a prima facie case, and therefore it is entitled to judgment as a matter of law.

"We review a denial of judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to the prevailing party." *Acumed LLC v. Advanced Surgical Svcs., Inc.*, 561 F.3d 199, 210 (3d Cir.2009) (*quoting Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir.2006)) (alterations and quotation marks omitted).

### A.

Risk advanced his Title VII claim under the "pretext" theory set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* framework, in order to assert a prima facie Title VII claim, Risk was obligated to produce evidence that: (1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *McDonnell*, 411 U.S. at 802, 93 S.Ct. 1817; *accord Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066 n. 5 (3d Cir.1996).

Borough acknowledges that Risk satisfied his burden with respect to elements (1), (3), and (4), but contends that Risk failed to establish element (2), thereby dooming his claim. To wit, Borough asserts that Risk cannot, as a matter of law, satisfy this requirement—namely, to prove that he was qualified for the position of Burgettstown municipal police officer at the time of the adverse action—because in 2007 the MPOETC revoked Risk's certification as a police officer upon reaching a determination that his initial certification was issued in error. Borough argues that since Risk's certification was issued in error, the MPOETC's determination effected

---

1. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343 and 42 U.S.C. § 1983. We have jurisdiction pursuant to 28 U.S.C. § 1291.

a retroactive revocation of Risk's certification. As such, Risk was never actually qualified to work as a police officer in Burgettstown, and therefore cannot satisfy element (2) of the *McDonnell Douglas* rubric.

■ Borough's argument fails pursuant to our holding in *Bowers v. NCAA*, 475 F.3d 524 (3d Cir.2007). In *Bowers*, we relied upon the Supreme Court's discussion of after-acquired evidence in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), in holding that after-acquired evidence cannot be used to contest a plaintiff's qualifications for purposes of establishing a prima facie case of discrimination.[2] *See Bowers*, 475 F.3d at 536–37 (*quoting McKennon*, 513 U.S. at 360, 115 S.Ct. 879) ("It is clear that the Defendants were completely unaware of Bowers' [disqualifiers] at the time the allegedly unlawful discrimination took place.... In turn, the Defendants could not have been motivated by knowledge they did not have, and thus cannot now claim that Bowers was deemed a nonqualifier because of his [after-discovered disqualifiers].") (quotation marks, alterations, and citations omitted).

Borough only became aware of the problem with Risk's certification more than *two years* after it had taken the adverse employment action upon which Risk's Title VII claim is founded, thereby rendering the fact of his faulty certification "after-acquired evidence." Thus, under *Bowers*, Borough was prohibited from using the fact of Risk's decertification to undermine his prima facie claim.

**B.**

Borough argues that *Bowers* should not control this issue because: (1) applying *Bowers* to this case would conflict with our precedent; (2) our jurisprudence indicates that *Bowers* was in fact an incorrect interpretation of *McKennon*; and (3) various non-controlling decisions by other courts dictate that we should overrule *Bowers* as an incorrect application of *McKennon*.

We find these arguments unavailing. The District Court correctly held that, under *Bowers*, such after-acquired evidence cannot be used by Borough as a means to contest Risk's qualifications as a police officer for the purposes of establishing Risk's prima facie discrimination claim. We therefore hold that the District Court was correct in prohibiting Borough from challenging Risk's prima facie Title VII claim with the fact of his decertification.

**III.**

Borough contends that the District Court erred in admitting certain pieces of evidence, and that without such evidence, the jury's verdict in favor of Risk could not have been sustained, thereby entitling Borough to judgment as a matter of law or, alternatively, a new trial. We hold that the District Court did not err in admitting any of the evidence contested by Borough.

**A.**

Borough argues that the District Court committed an error of law in allowing Risk to offer testimony concerning his decertification from the Burgettstown police force. However, as evidenced by the trial record,

---

**2.** Though Bowers addresses a claim under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12132, 12182 ("ADA"), Bowers' discussion of the use of after-acquired evidence to rebut the "qualification" element of an ADA claim is equally applicable to the instant case, which involves a Title VII claim, since the prohibition of using after-acquired evidence applies to both claims under the ADA and Title VII. *See Bowers v. NCAA*, 475 F.3d 524, 537 (3d Cir.2007) (citing to *Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072 (3d Cir.1995), a case involving a Title VII claim, when discussing the prohibition of using after-acquired evidence to dispute the "qualification" element of a discrimination claim).

Risk's testimony regarding his decertification was not offered for the purpose of contesting the validity of the decision to decertify him.[3] *See* App. at 505–11. Instead, Risk's testimony was offered to buttress his credibility by clarifying that he did not intentionally or knowingly mislead the MPOETC when applying for certification in Pennsylvania, and that he was not at fault for the confusion regarding his certification.

■ It is well-established that the doctrines of issue preclusion and collateral estoppel operate to preclude relitigation of an issue that has been previously decided. *New Hampshire v. Maine*, 532 U.S. 742, 748–49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Since Risk did not attempt to relitigate any of the issues surrounding his decertification, his testimony on that topic was not precluded, and the District Court correctly admitted it.

### B.

Pursuant to a request by Risk, the District Court took judicial notice of The Pennsylvania Police Tenure Act, 53 Pa. Cons.Stat. Ann. §§ 811–15 ("PTA"),[4] "solely because its seniority provisions were relevant to pretext; that is, layoffs must occur in reverse order of seniority, and Risk had been hired before others who were not furloughed." App. at 7.

The PTA, by its terms, applies only to boroughs with a police force of fewer than three members. 53 Pa. Cons.Stat. Ann. § 811. Burgettstown had a total of ten members on its police force at the time of Risk's termination. Borough argues that in taking judicial notice of the PTA, and in charging the jury that it could find that Borough's explanation for terminating Risk was pretext if it found that the seniority protocol mandated by the PTA was not followed, the District Court committed an error of law.

■ While Borough is correct in that the PTA does not govern the employment procedures of Burgettstown's police force, we note that such procedures are instead governed by the Pennsylvania Borough Code, 53 Pa. Cons.Stat. Ann. §§ 46171 *et seq.* ("Borough Code"), which applies to boroughs with police departments comprised of three or more members. *Id.* at § 46171. Significantly, the Borough Code mandates precisely the same seniority protocol as the PTA. *See id.* at § 46190.[5]

---

3. Indeed, Risk admitted in open court that he had been decertified subsequent to his termination. *See* App. at 140–41.

4. The Police Tenure Act provides, in pertinent part:

   If, for reasons of economy or other reasons, it shall be deemed necessary by any township of the second class, or any borough or township of the first class within the scope of this act, to reduce the number of paid employees of the police department, then such political subdivision shall apply the following procedure: [...] If the number of paid employees in the police force eligible to retirement is sufficient to effect the necessary reduction in number, or if there are no persons eligible for retirement, or if no retirement or pension fund exists, then the reduction shall be effected by furloughing the man or men, including probationers, last appointed to said police force. Such

   removal shall be accomplished by furloughing in numerical order, commencing with the man last appointed, until such reduction shall have been accomplished.
   53 Pa. Cons.Stat. Ann. § 813.

5. The Borough Code provides, in pertinent part:

   If for reasons of economy or other reasons it shall be deemed necessary by any borough to reduce the number of paid employees of the police or fire force, then such borough shall apply the following procedure: [...] if the number of paid employees in the police force or fire force eligible to retirement is insufficient to effect the necessary reduction in numbers, or if there are no persons eligible for retirement, or if no retirement or pension fund exists, then the reduction shall be effected by furloughing the person or persons, including probation-

Thus, the District Court's jury instruction regarding the PTA was in fact harmless, since regardless of whether the PTA or the Borough Code applies, the substance of the District Court's instruction was correct—namely, that as a matter of law, Risk was protected by the seniority furlough provisions that were ignored by Borough in terminating Risk.

Accordingly, we hold that the District Court did not commit reversible error in taking judicial notice of the PTA rather than the Borough Code. *See Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1213 (3d Cir.1995) ("errors in the admission ... of evidence cannot be grounds for reversal or a new trial if they constitute harmless error").

### C. Cross–Pin

During pre-trial motion practice, the District Court granted Borough's motion for summary judgment on Risk's constitutional claims, ruling that Risk could "premise no claim of constitutional violation on a restriction of his right to wear a symbol of his Christian beliefs on the lapel of his police uniform while performing his duties in the community with the significant government authority invested by his office." App. at 98. Nevertheless, the District Court permitted Risk to introduce evidence regarding the cross-pin and Chief Roberts' request that it be removed. The District Court also instructed the jury that it could "consider the fact that the Chief of Police asked Mr. Risk to remove his cross pin as evidence of discriminatory animus."

■ The mere fact that Chief Roberts' request that Risk remove his cross-pin was constitutionally permissible does not preclude Risk from pointing to that action as evidence of discriminatory animus in support of his Title VII claim. *Cf. Daniels v.*

*City of Arlington, Texas,* 246 F.3d 500, 506 (5th Cir.2001) (holding, in the face of the police department's constitutionally permitted regulation prohibiting the wearing of cross-pins, that the police officer asserted sufficient evidence to establish a prima facie Title VII claim against the department). Accordingly, the District Court did not err in admitting evidence regarding Risk's cross-pin and Chief Roberts' reaction to that pin.

### D.

Borough argues that the District Court erred in admitting the testimony of Amy Prevost, a clerk at a local mini-mart, regarding: (1) a conversation Prevost overheard wherein Lieutenant Murray spoke disparagingly of Risk's religious beliefs; (2) and a conversation that Prevost had with Chief Roberts wherein Roberts made statements relating to Risk's work performance. According to Borough, the statements attributed to Murray and Roberts are inadmissible hearsay, and therefore should not have been allowed by the District Court.

■ Borough is incorrect. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, *offered into evidence to prove the truth of the matter asserted.*" Fed.R.Evid. 801(c) (emphasis added). Since the statements attributed to Murray and Roberts were not offered to prove the truth of the matter asserted by each respective statement, they are not hearsay. *See Abrams,* 50 F.3d at 1218 n. 16 ("[W]e are persuaded that [the witness'] testimony that he heard of the decision to terminate [the plaintiff] from someone else could have been admitted as nonhearsay as it was not offered for the truth of the matter asserted ( [i.e.,]

---

ers, last appointed to the respective force. Such removal shall be accomplished by furloughing in numerical order commencing

with the person last appointed until such reduction shall have been accomplished.
53 Pa. Cons.Stat. Ann. § 46190.

that [the plaintiff] was being terminated) but [rather] as evidence that [a third party], and not [the witness], had made the termination decision . . .").

Prevost's testimony regarding the statements made by Murray and Roberts was not hearsay. The District Court therefore did not err in admitting the testimony.

## IV.

Borough asserts that the District Court erred in its jury instructions regarding: (1) the Police Tenure Act; (2) the cross-pin; (3) Borough's workplace culture; and (4) the non-production of recordings of Borough Council meetings, and as a result of those errors, Borough is entitled to a new trial.

"Where the challenge to a jury instruction is a challenge to the instruction's statement of a legal standard, we exercise plenary review." *United States v. Urban,* 404 F.3d 754, 779 (3d Cir.2005) (*quoting United States v. Zehrbach,* 47 F.3d 1252, 1260, 1264 (3d Cir.1995)) (quotation marks and citation omitted). We have carefully examined all of the jury instructions and Borough's objections to those instructions, and conclude that the District Court did not commit reversible error regarding its instructions to the jury.

## V.

Based on the foregoing, we hold that the District Court did not err in denying Borough's motion for judgment as a matter of law or for a new trial, and we will affirm its judgment dated November 14, 2008.